637 So.2d 1120 (1994)
STATE of Louisiana
v.
Robert McKINNEY.
No. 93-KA-1425.
Court of Appeal of Louisiana, Fourth Circuit.
May 17, 1994.
*1121 Harry F. Connick, Dist. Atty., Jack Peebles, Asst. Dist. Atty., New Orleans, for plaintiff/appellee.
Elizabeth W. Cole, Supervising Atty., Theresa M. Bold, Student Atty., Tulane Law Clinic, New Orleans, for defendant/appellant.
Before KLEES, CIACCIO and JONES, JJ.
*1122 JONES, Judge.
On June 25, 1992, the appellant was indicted for the second degree murder of Ms. Martha Morales (Morales). Although counsel was appointed and arraignment was set for July 10th, neither the minute entry of that date nor of any other date reflects that any formal arraignment or plea was taken. On April 1, 1993, at the conclusion of a two-day trial, a twelve-member jury found him guilty as charged. He appeals his conviction.

FACTS:
On May 1, 1992, police officers were called to 1901-1905 Charbonnet Street, which was a large house with a small upstairs apartment. Neighbors had complained that although Ms. Morales, the owner of the house, had not been seen for some time, two unknown men had been seen coming and going from the house. The officers met with a neighbor and then went to the house and knocked on the door. Receiving no answer, one officer walked around the back of the house and saw two men exiting a sliding glass door. The officers gave chase, immediately capturing one man, Harris Collins. The officers called in the assistance of a canine unit and eventually captured the second man, the defendant Robert McKinney (McKinney), hiding in a shed farther down the block. The officers then entered the house and found the body of Ms. Morales lying on a bed in a downstairs bedroom, covered with a blanket. It was quite obvious that Ms. Morales had been dead for some time. The closet in the room where Ms. Morales was found had been ransacked, and there were items missing from a living room located across from the bedroom where Ms. Morales was found. A micro-cassette was seized from a second-floor bedroom.
Collins and McKinney were detained, and the homicide division was contacted. Collins and McKinney were eventually taken to police headquarters where they each gave statements. Collins was later released, and McKinney was charged in Ms. Morales' death.
An autopsy performed on Ms. Morales revealed that she had been dead for approximately one week prior to the autopsy, which was performed the day after her body was discovered. She sustained extensive injuries to her face and neck, and there was evidence of both smothering and strangulation. Her voice box had been broken, there were extensive hemorrhages to her neck, and a bone in her throat had been bent inward.
Guy Morales (Mr. Morales), the victim's son, testified that he lived in Los Angeles. Mr. Morales testified that in the last week of April, 1992, he had called his mother and left messages on her answering machine for her to call him, but she failed to do so, even after rioting erupted in Los Angeles. He testified that Ms. Morales lived alone in the house and the apartment. Mary Aubry, who also lives in California, testified that during the last week of April she tried to contact Ms. Morales, but her messages were not returned.
Collins testified that he lived in a house near Ms. Morales' in April 1992, but he did not know her. He testified that his house did not have water or electricity. He testified that on Wednesday, April 29th, McKinney, who he knew through McKinney's brother Earl Wallace, came to his house with some food. McKinney told him that he was staying in the house on Charbonnet Street and that the owner had left him in charge of the house while she was in California. McKinney then offered to take Collins to the house to bathe and wash his clothes. Collins agreed and accompanied him to the house. Collins testified that as they entered the house, McKinney told him that he had killed the owner, and then he stated that he was only kidding. McKinney took him into the house through a side door, and Collins went upstairs and took a shower. He and McKinney ate, and he then took a nap. McKinney told him that the owner was going to call later, but no calls were received from her. Later that night McKinney's girlfriend, Phyllis Roberts (Roberts), joined them at the house, and all three slept there that night in an upstairs bedroom.
Collins testified that he stayed at the house through Friday, May 1st, leaving only during that time to buy crack cocaine, which he and McKinney smoked at the house. Collins testified that McKinney kept telling him that the owner was going to call, but he instructed him not to answer the telephone when it rang, indicating that the answering *1123 machine would take messages. On Friday, Anthony Young (Young) came to the door, and McKinney went outside to talk to him. When McKinney came back inside, he told Collins that he was glad that no one around there knew his name. McKinney also told him that the owner would be gone another week due to rioting in Los Angeles. After smoking more crack, McKinney told Collins that the owner must be back in town if Young had come to the house. When questioned about this, McKinney again told Collins that he had killed the owner. McKinney said that she had owed him money, and when she tried to pay him with a check he could not cash, he smothered her. McKinney told him that he decided to smother her because a gunshot would be too loud and stabbing would involve too much blood. McKinney then took him into a downstairs bedroom, and when he opened the door an odor emanated from the room. Collins looked inside and saw something lying on the bed under a sheet. Collins testified that McKinney told him that he had killed someone before and had lived at that person's house until the utilities had been cut off and the food in the house had been consumed.
Collins testified that after talking about the killing, he and McKinney left the house, bought more crack, and returned and smoked it. He testified that he called his sister to tell her what had happened, and then he and McKinney smoked a joint and drank some wine. He insisted that he was going to turn himself into the police later that night, but McKinney had asked him to stay for a while. When the police arrived that evening, he ran but was captured. He testified that he was taken to police headquarters, where he gave a statement, but he was later released. He was not arrested in connection with this case.
Collins testified that sometime prior to showing him the body, McKinney played a tape for him that sounded like it had been made by McKinney and his girlfriend. This tape was played for the jury over the defendant's objection.[1] Collins also testified that he received a letter from McKinney, delivered by Ms. Roberts' sister, which he turned over to the prosecution. In the letter, which was read to the jury, McKinney admitted killing Ms. Morales and told Collins that the police were unable to find any fingerprints to tie him to the killing. McKinney then advised Collins to go into hiding for four months until McKinney's trial was over, and then McKinney would be free. It was determined, and the defense stipulated, that the letter was written by McKinney.
Earl Wallace (Wallace), the defendant's brother, testified that he knew Ms. Morales through his friend Young, and both men did work for her. He testified that Ms. Morales had known McKinney only a week before her death. Wallace testified that on April 24th, he saw McKinney and a friend driving Ms. Morales' van, and he caught a ride with them. The trio drove around for a time, drinking, and then went to Ms. Morales' house. McKinney went inside and then came back out, saying that she was asleep. When the trio later wrecked the van, McKinney told him that they did not have to worry because he had killed Ms. Morales. They went back to her house, and McKinney showed him the body. Wallace testified that McKinney then nudged her body to show that she was dead. Wallace testified that McKinney told him that he killed her because she refused to pay him in cash and because he thought she was underpaying him. McKinney told him that he had grabbed her by the neck, thrown her down, and smothered her with a pillow. Wallace testified that although he saw Ms. Morales' body on April 24th, he did not tell anyone about it at first because he was afraid he would get into trouble. However, on Thursday (April 30th), he told Young about it. He admitted that when he testified before the grand jury he stated that he did not see the body and that he also told the grand jury that McKinney did not kill Ms. Morales. Wallace denied taking drugs with McKinney inside Ms. Morales' house.
*1124 Young, who admitted having a prior conviction in 1988 for simple burglary, testified that he did maintenance work for Ms. Morales. He testified that when Wallace told him on Thursday that McKinney had killed Ms. Morales and that he had seen her body, he did not believe Wallace. He testified that when he went to work the next day, he told his boss, Eddie Williams (Williams), about what Wallace had told him. When they finished working that day, Young and Williams went to Ms. Morales' house to check on her. McKinney answered their knock and told them that she was not home and that he was awaiting her return because she owed him money. Young testified that he and Williams left the house and went to see Ms. Ally Stewart (Stewart), a friend of Ms. Morales, who they both knew. After talking with Ms. Stewart, they called the police and then went to wait for the police at the home of Ms. Morales' neighbor, "Miss Terry." Young testified that he watched the police knock on the door of Ms. Morales' house, saw Collins run out the back of the house, and saw the police return McKinney to the house.
Williams testified that he owned a construction business, that he had done work for Ms. Morales, and that he spoke with her just about every day. He testified that he had last seen her and her van on April 24th. He testified that on the way to work on May 1st, Young told him what Wallace had told him about Ms. Morales' death. After work that afternoon, he and Young went looking for her van because Williams knew that she would not loan the van to anyone who she did not know well. He testified that when they did not find the van, they drove to Ms. Morales' house where no one answered the door. They went across the street to "Miss Terry's" house, but she was not home. They then went to Young's mother's house to try calling Ms. Morales' relatives in Los Angeles, but they could not get through because of rioting. After contacting another acquaintance of Ms. Morales who had not been able to get in touch with her recently, Williams and Young returned to Ms. Morales' house. This time, McKinney answered the door and told them that Ms. Morales had asked him to watch the house in her absence and that she owed him money. Williams testified that he saw another man inside the house. They then went to Ms. Stewart's house, where they called the police, and then returned to "Miss Terry's" house to wait for the police.
Ms. Stewart testified that she was a friend of Ms. Morales. She testified that Ms. Morales lived alone in the house and the apartment. She testified that she had tried unsuccessfully to contact Ms. Morales the week prior to the discovery of her body and had been told by others that Ms. Morales had gone to Baton Rouge or Alexandria. She testified that she tried locating Ms. Morales on Thursday and found that she was not in Los Angeles nor Chicago, where her family lived. She testified that when Williams and Young told her on Friday what McKinney had told them, she feared Ms. Morales was dead or hurt because she knew that Ms. Morales would not have let the men stay at her house. She then called the police.
After being arrested, McKinney gave a statement. Because he indicated to the officers that he had not completed high school, the officers had him read a paragraph out of a newspaper and then explain to the officers what he had read. In his statement, McKinney told the officers that he did not have an address. He told them that he and Wallace gained entrance to Ms. Morales' house on Tuesday, April 28th through a back patio door, but they did not find Ms. Morales' body until Thursday. He admitted staying in the house and consuming drugs with Wallace and Ms. Roberts, and he stated that Collins also stayed at the house. He admitted making the audio tape and contended that he was "loaded" and just "acting stupid" when he did so.

DISCUSSION:

A. Errors Patent
A review of the record for errors patent reveals two errors. The record contains no docket master entry or minute entry of the appellant's arraignment and plea of not guilty. The case was allotted on June 26, 1992, and on June 29th, counsel was appointed. The arraignment was set for July 10th. However, neither the docket master entry nor the minute entry of that date indicate that the appellant was formally arraigned or *1125 pled not guilty. La.C.Cr.P. art. 831 provides in part that a defendant must be present at arraignment and when a plea is given unless, as per art. 832, he voluntarily absents himself. However, art. 832 further provides that "the defendant may always object to his absence at the arraignment or plea to the merits, provided the objection is made before the commencement of trial." In addition, art. 555 provides in part: "A failure to arraign the defendant or the fact that he did not plead, is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pled not guilty." Here, the appellant did not object to any lack of arraignment, nor does he allege it as error now. As such, the failure of the record to show if the appellant was arraigned on the charges in this case is harmless error. State v. Bray, 548 So.2d 350 (La.App. 4th Cir.1989).
In addition, the docket master indicates that the appellant was sentenced immediately after his motion for new trial was denied. The docket master entry does not indicate whether the defendant waived his right to a twenty-four hour delay in sentencing as provided in La.C.Cr.P. art. 873. Neither the record before this court nor the district court record contains the actual minute entry of sentencing. However, in State v. Collins, 584 So.2d 356 (La.App. 4th Cir. 1991), this court held that the failure to observe the delay would be deemed harmless error where the defendant did not challenge his sentence on appeal. Therefore, in the present case where no error is raised as to the defendant's sentence, the failure of the trial court to observe the delay is considered harmless error.[2]

B. Assignments of Error

I.
By his first assignment of error, the appellant contends that the trial court erred by denying his motion to suppress the evidence. He does not argue that all the evidence seized from the house should have been suppressed, but instead he challenges the admissibility of only the items seized from an upstairs bedroom. It appears that the evidence seized from that room consisted of photographs and the micro-cassette tape. The appellant argues that because he was living in that bedroom, he had a privacy interest in any evidence seized from that bedroom, and the officers did not have the authority to make a warrantless search of that room and seizure of items in that room.
It is clear that the micro-cassette was seized from the upstairs bedroom at the time the police discovered the victim's body. With respect to the photographs taken from the room, it is unclear whether they were seized by the police or were given to the police by the victim's family sometime after the murder. At the suppression hearing, Det. Suarez testified that the photographs and a few other personal items seized from the upstairs bedroom were discovered by the victim's family when they were making an inventory of the house sometime after the murder, and the family gave them to the police because they knew they did not belong to the victim. At trial, he testified that the evidence confiscated from the house included some photographs and some "other items" that were taken from the upstairs apartment sometime "later". However, Det. Stewart testified at trial that he seized the micro-cassette and the photographs from the bedroom. Thus, the issue of the appellant's expectation of privacy is squarely before this court.
A defendant may not assert the exclusionary rule unless his constitutional right to be free from unreasonable searches and seizures, as guaranteed by the United States and Louisiana Constitutions, has been violated. To establish such a violation, the defendant must first show that he had a legitimate expectation of privacy in the area searched. U.S. v. Ibarra, 948 F.2d 903 (5th Cir.1991). Whether a defendant has a constitutionally protected expectation of privacy involves a two part inquiry. A defendant must first show that he has a reasonable expectation of privacy in the area searched *1126 for the items seized. Second, a defendant must also show that society is prepared to accept the expectation of privacy as objectively reasonable. State v. Ragsdale, 381 So.2d 492, 497 (La.1980); State v. Karston, 588 So.2d 165 (La.App. 4th Cir.1991).
In support of his contention that he had a privacy interest in the upstairs bedroom, the appellant quotes United States v. Haydel, 649 F.2d 1152 (5th Cir.1981), cert. den. 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982), which noted that property ownership is but one factor to consider in determining whether an expectation of privacy exists:
Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.

Haydel, at 1155.
In Haydel, the court found that the defendant had a reasonable expectation of privacy in his parents' house in that they gave him permission to use the house and gave him a key to the house. Likewise, in United States v. Jackson, 647 F.Supp. 995 (S.D.Tex.1986), the court found the defendant had a reasonable expectation of privacy in the room that he rented from his mother in her apartment, where he and his girlfriend stayed in the room, his mother considered it to be his room, and the apartment manager was aware that the defendant was staying in the room. However, Jackson was reversed on other grounds, 818 F.2d 345 (5th Cir.1987). In United States v. Robertson, 606 F.2d 853 (9th Cir.1979), the court noted that the defendant had a reasonable expectation of privacy in the room from which his clothes were seized where he had stayed in the room with the owner's permission.[3]
Here, the appellant argues that he had a reasonable expectation of privacy in the upstairs bedroom because he had been living there. However, a reading of the trial transcript clearly shows that the appellant was staying at the house without the owner's permission. The witnesses who knew the victim all testified that she lived alone and that she would not have allowed the defendant to stay with her or stay in the house in her absence. Although the appellant told Collins and Wallace that he was staying in the house with the victim's permission while she was away, Collins also testified that when the appellant told him that he had killed the victim, he also told him that he had killed someone else in the past and had stayed at that victim's house until the utilities were turned off and the food in the house was gone. In his statement, which was taken in the early morning hours of May 2nd, the appellant first stated that he had been staying at the house "for about two days", and then he stated that he had been in the house with Collins or Wallace since "Wednesday". However, it was estimated that the victim had been dead approximately a week at that point, and Wallace testified that he saw her body on Friday, April 24th. Thus, even taking the appellant's statement that he had been staying in the house as true, he could not have had the victim's permission to stay there because she was already dead by the time he started staying there. In addition, in his statement to police he admits he has no address. Given these facts, it does not appear that the appellant had a reasonable expectation of privacy in the upstairs bedroom, one that society would recognize.[4]
It must be noted that when discussing the motion to suppress the evidence at the first hearing, the trial court spoke of a "crime scene" exception to the warrant requirement. As noted by the appellant, this "exception" has been rejected by the United States Supreme Court. Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984). *1127 However, because the appellant had no reasonable expectation of privacy in the house nor the upstairs bedroom, he cannot now complain about the seizure of evidence by the police from the bedroom. This assignment has no merit.

II.
By his second assignment of error, the appellant contends that the trial court erred by denying his motion to suppress the statement. He argues that the State failed to prove that he freely and voluntarily waived his Miranda rights prior to giving the statement.
The general test for the admissibility of a statement was set forth by this court in State v. Bell, 613 So.2d 744, 746 (La.App. 4th Cir.1993):
The State has the burden of proving that a statement given by a defendant was freely and voluntarily given, not the product of threats, promises, coercion, intimidation, or physical abuse. R.S. 15:451; State v. Seward, 509 So.2d 413 (La.1987); State v. Brooks, 505 So.2d 714 (La.1987), cert. den. Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); State v. Daliet, 557 So.2d 283 (La.App. 4th Cir. 1990). To establish the admissibility of a statement made by an accused person in custodial interrogation, the State must prove that the accused had been advised of his/her Miranda rights, and that he/she waived these rights prior to interrogation. The determination of a statement's admissibility is within a trial court's discretion, and it should not be disturbed unless it is not supported by the evidence. Brooks, supra; Daliet, supra.

Here, two hearings were held on the motions to suppress. At the first hearing, Det. Suarez testified he was present when Det. Stewart advised the appellant of his Miranda rights, and the appellant indicated he understood his rights and that he wanted to make a statement. Det. Suarez testified the appellant signed a waiver of rights form, which included the affirmation that he could read and write English. He also testified that no force, coercion, or promises were made to the appellant prior to taking the statement. In addition, the officers had him read aloud a paragraph out of a newspaper article to make certain he could read. Det. Suarez testified that although he was not present for the entire statement, he was present when the rights were read and when the appellant read the newspaper article and again when the appellant read over the typed statement. Det. Suarez' testimony at trial was similar to that given at the suppression hearing, but at trial Det. Suarez could not remember if the appellant's ability to read was tested.
At the second suppression hearing, Det. Stewart testified that he advised the appellant at the homicide office of his rights, and the appellant indicated he understood his rights and signed the waiver form. The appellant then told him he would make a statement. Det. Stewart testified that he had the appellant read a newspaper article aloud to show that he could read. Det. Stewart testified that this reading was accomplished before the statement was taken. In addition, no force, promises, nor coercion was used to obtain the statement. His testimony at trial tracked that given at the suppression hearing, with the additional testimony that he decided to test the appellant's reading ability because the appellant told him he had only completed the ninth grade.
In his brief, the appellant does not contend that the officers failed to advise him of his rights, nor does he allege that the statement was the product of force or promises. Instead, he argues that the State failed to prove that the statement was freely given because the officers did not have him read the paragraph from the newspaper prior to signing his waiver form and because the advisement of his rights and the reading of the paragraph were not included in the beginning of the typed statement. However, it is clear that the officers determined that the appellant could read and understand English prior to taking the statement. The appellant fails to point to anything which would rebut the officers' evidence that they determined that the appellant understood and waived his Miranda rights prior to giving the statement. In addition, as noted by the State the fact that the statement was given at the homicide office was not in itself so "coercive" *1128 as to render the statement involuntary. As such, the trial court did not abuse its discretion by denying the motion to suppress the statement. This assignment has no merit.

III.
By his last assignment, the appellant contends that the trial court erred by overruling the appellant's objection to, and motion for mistrial in connection with the jury's viewing the crime scene and the procedure of allowing the jurors to ask questions at the scene which were later transcribed for the record. The trial transcript reveals that prior to going to the scene the defense objected, and again at the scene the defense objected to the jury viewing the entire house. The court agreed in part and indicated that the jury would only be allowed to view the portions of the house which were relevant to the case. In addition, the court indicated that it would allow the jury to ask questions as it toured the scene, and it would not allow the State and the defense to answer these questions directly, but rather it would allow the two parties to answer these questions only by way of additional testimony or by argument in closing. The defense counsel then moved that a copy of these questions be given to both the defense and the State and that they "be allowed to enter into a joint stipulation which answers all the questions." The jury then viewed the scene.
After all parties had returned to the courthouse, out of the jury's presence, the defense moved for a mistrial, alleging that the tour of the house was unduly prejudicial to the appellant because members of the victim's family were present, there was a memorial wreath on the door to the house, and one of the rooms contained a Bible. In addition, the defense argued that the jury should not have been allowed to ask questions while at the scene because this practice made the jurors "investigators" of the crime, and defense counsel argued that he could not effectively cross-examine a witness who the State presented to answer a juror's question. Defense counsel also argued that the practice of allowing the jury to ask questions allowed the State to determine what it still needed to prove in order to convict the defendant. In response, the court noted that the family members remained outside during the jury's tour of the house and had no contact with the jury. In addition, the court noted that the parties would not be able to answer the questions directly, but rather they would be allowed only to address the jury's concerns through testimony or argument. Based upon these safeguards, the court denied the motion for mistrial. It also denied the defense motion to prohibit the answering of these questions through testimony or argument, but it noted that it would not allow any repetitious testimony. The court noted that the "vast majority of those questions, to be honest with you, have already been answered by the testimony already had." The court then granted the defense motion that the questions be made a part of the record. The State pointed out that the defense did not object prior to the taking of questions, and defense counsel agreed but argued that he had made a mistake by failing to do so. The jury was then brought back into court.
The defense now argues that the jury's viewing of the house was unduly prejudicial because the scene had sustained changes since the time of the murder, because family members of the victim were present, and because other objects such as family pictures and a Bible had been placed in the house since the murder. It must be noted that there is no indication in the record that "additional" items, if any, were placed in the house prior to the jury viewing the scene. Nor is there any indication that the crime scene had changed dramatically. These grounds for the objection to the jury viewing the scene were not raised at the time of trial. This court has held that a new basis for an objection cannot be raised for the first time on appeal. State v. Straughter, 630 So.2d 884 (La.App. 4th Cir.1993); State v. Berryhill, 562 So.2d 1105 (La.App. 4th Cir.1990).
As noted by the State, La.C.Cr.P. art. 762 provides in part:
Sessions of court shall be held at the parish courthouse and, if there is more than one courthouse in a parish, sessions may be held at any such courthouse, or sessions may be held at places within the *1129 parish other than the courthouse or courthouses in the discretion of the court:
* * * * * *
(2) To allow the jury or judge to view the place where the crime or any material part thereof is alleged to have occurred, or to view an object which is admissible in evidence but which is difficult to produce in court. At this view, the court shall not permit the taking of evidence except in connection with the place or object; ...
The trial court has the discretion to determine whether a motion to view a crime scene should be granted or denied, and the trial court's determination will not be disturbed on appeal absent the showing of an abuse of this discretion. State v. Sweeney, 443 So.2d 522 (La.1983); State v. Carney, 476 So.2d 364 (La.App. 4th Cir.1985). With respect to the appellant's remaining ground for this claim, the trial court noted that the victim's family remained outside the house while the jury toured the scene and had no contact with the jury. As such, it does not appear that the mere fact that the victim's family was present outside the house would have so prejudiced the appellant as to deprive him of a fair trial. Thus, it does not appear that the trial court abused its discretion by allowing the jury to view the crime scene. This claim has no merit.
The majority of the appellant's argument with respect to this assignment, however, is geared toward the trial court's allowing the jury to ask questions while touring the house and then allowing the parties to address these questions by either testimony or argument. The appellant raises many arguments on why this practice deprived him of a fair trial. He first argues that by allowing the jurors to ask questions, they became factfinders, and the trial court should have advised the jurors that their questions must be limited to questions that would clarify or explain prior testimony as it related to the crime scene. However, the defense failed to move for such a limitation prior to the court's allowing the jury to pose questions. Indeed, defense counsel admitted at trial that he did not object to the practice of taking questions prior to allowing the jury to pose the questions, but he argued that such failure was a mistake on his part. As per art. 841, an error cannot be raised in the absence of a contemporaneous objection. As noted by this court in State v. Milton Taylor, 635 So.2d 416 (La.App. 4th Cir.1994): "The contemporaneous objection rule exists, not only so that a trial judge may correct the error at the time it is made, but it also serves notice in the record that the complained of conduct was so noticeable as to create prejudice in the minds of the jurors." Here, defense counsel's failure to ask for this limitation precludes his raising this claim for the first time on appeal.
The appellant also argues that the questions showed speculations of the jury that produced "harmful error", but he does not elaborate on this statement. He next argues that the asking of these questions amounted to a discussion of the case among the jurors prior to the conclusion of the trial and to their forming opinions of the case prior to the trial's end. Again, the appellant does not specify how these questions amounted to a premature deliberation of the case. In addition, the appellant failed to raise this ground of objection at trial. As such, he is estopped from raising it now. Straughter; Berryhill. Likewise, his argument on appeal that the questions lessened the State's burden because they showed a need for the defense to provide exculpatory evidence also lacks specificity and was not raised at trial.
The appellant finally argues that by allowing the jury to pose questions, the State was given an unfair advantage because it could address the jury's concerns in closing argument. However, both the State and the defense had this opportunity, and the appellant does not specify how this "robbed" him of his right to a fair trial.
It is significant that the trial court stated that the questions posed by the jury, had already been addressed by testimony, and the court stated that it would not allow either side to present repetitious testimony merely to answer these questions. Indeed, the State presented only two witnesses after the jury viewed the scene, and neither of these witnesses addressed the questions *1130 raised by the jurors. The better practice for the trial court is not to allow the jurors to ask questions when viewing a crime scene. However, it does not appear that having allowed the jurors to ask these questions in this case so prejudiced the appellant as to deprive him of a fair trial, especially given the fact that the appellant failed to object to the taking of the questions prior to the jury viewing the crime scene. This assignment has no merit.
For the foregoing reasons, the conviction of the defendant is affirmed.
AFFIRMED.
NOTES
[1] The Court has reviewed the tape as well as all other evidence in this appeal. A transcript of the tape was presented at trial by the State and published to the jury over the defendant's objection. However, that transcription was not offered into evidence or made a part of the record.
[2] Collins distinguished State v. Augustine, 555 So.2d 1331 (La.1990), where the Court held that the failure to waive the twenty-four hour delay could not be considered to be harmless if the defendant challenges his sentence on appeal.
[3] United States v. Elwood, 993 F.2d 1146 (5th Cir.1993), also cited by the appellant, is not really relevant here in that it dealt with the expectation of privacy of a passenger in a car under the Fourth Amendment.
[4] See footnote 22 in United States v. Jacobsen, 466 U.S. 109, 122, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984), where the Court notes that a burglar has no legitimate expectation of privacy in the place he has burglarized.