320 So.2d 129 (1975)
STATE of Louisiana
v.
William R. BRUMLEY.
No. 56354.
Supreme Court of Louisiana.
October 1, 1975.
Rehearing Denied October 31, 1975.
James D. Sparks, Jr., Monroe, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Walter L. *130 Smith, Jr., L. J. Hymel, Jr., Asst. Attys. Gen., for plaintiff-appellee.
DIXON, Justice.
Billy Brumley was convicted on November 19, 1974 of the murder of Cheryl Bedenbender, an eleven year old child. Defendant was sentenced to life imprisonment and appeals to this court preserving seven assignments of error which incorporate twelve objections made during trial.
In his third assignment of error, defendant argues that the trial court erred by curtailing defendant's voir dire examination. This assignment is based upon seven questions which defendant intended to ask each prospective juror but which were ruled improper for voir dire examination.
1. "Now, if I were to tell you and say that if a statement or a confession of the accused, statement or confession, however you have it were introduced and accepted by this court in evidence in this trial what affect (sic) would that have upon you?
. . . . . .
2. ". . . do you think that physiclogical (sic) pressures may cause an innocent (sic) person to confess.
3. ". . . if a confession is introduced into evidence in this case will you take into consideration these points, where it was obtained, under what circumstances (sic) was it obtained, by whom was it obtained.
4. ". . . do you think that being alone and under police custody and interrogation may tend to frighten a man and may make him say things under a different state of mind than he usually has.
5. ". . . do you think there is such a thing as mental coercion.
6. ". . . in determining, that determining whether a statement is voluntary, would you take into consideration the age, the background, the mental capacity and the family background of the accused.
7. ". . . that determining whether a statement is voluntary, would you take into consideration the police motives at the time of the questioning and whether they were trying to assist the accused or to obtain a statement."
The trial court sustained objection to these questions, instructing defense counsel that it would be proper to ask whether the juror would follow the instructions given by the court as to the necessity of free and voluntary confessions.
With the exception of questions three and six, we agree that there was no error in excluding the questions propounded by defense counsel as inappropriate for voir dire examination.
In State v. Jones, 282 So.2d 422 (La.1973), we held that because the object of the law is to select impartial jurors to try the issue between the State and the defendant, counsel in criminal cases should be allowed a wide latitude in voir dire examination. The settled rule in this State is that the admissibility of confessions is for the trial court, whereas the weight to be given the confession is for the jury. State v. Adams, 296 So.2d 278 (La.1974); State v. Asher, 294 So.2d 223 (La.1974); State v. Green, 282 So.2d 461 (La.1973); State v. Doiron, 150 La. 550, 90 So. 920 (1922).
Moreover, our opinion in Doiron expressed the purpose of presenting evidence of the circumstances surrounding the confession first to the court for the determination of admissibility and then to the jury for the determination of the weight to be given the confession:
". . . As before stated, we can see no reason why the trial judge cannot send the jury out, and first determine for himself the question of the admissibility of the alleged confession, in order *131 that, if he decides to exclude it, the jury may not be affected by any prejudicial matter preliminarily brought out. But where he does determine that it is admissible, the accused is entitled to have all the circumstances go before the jury as a preliminary matter, for they have the right to determine the weight of all evidence, and to say whether statements, alleged to have been voluntarily made, were in fact so made, and, if not, to disregard them. . . ." (90 So. 920, 921).
In his third and sixth questions, defendant sought to assure that jurors were not accepted who would not take into consideration the age and background of the defendant and the circumstances under which the confessions had been obtained. A defendant who is unable to inquire of potential jurors as to any tendentious attitude toward these criteria is unable to effectively make challenges for cause and peremptory challenges. Defendant's questions were not an attempt to lecture on the law of confessions nor were they an attempt to induce the jurors to commit themselves in advance. Nor does it offer adequate security toward obtaining an unbiased jury, for a potential juror, in response to the general question whether he will accept the law as given him by the court, to recite that he will accept such instruction when the juror has no concept of the complex nature of the law[1] and where the issue is so interrelated to basic rights under the Fifth Amendment to the Constitution of the United States and Art. 1, § 16, La.Const. of 1974.
Because of the importance of the rights involved and policy of the State in allowing defense counsel a wide latitude on voir dire examination, we hold that the trial court abused his discretion by refusing to allow defense counsel to propound the heretofore discussed questions to potential jurors on voir dire.
Because we reverse and remand for a retrial, and because of the likelihood that upon retrial confessions will again be introduced which defendant claims were gained in violation of his constitutional rights, we consider the issues raised with respect to the admissibility of confessions allegedly given by defendant.
During trial defendant objected to the introduction of evidence of three oral inculpatory statements or confessions, one written confession, and a demonstration given to police by defendant during the interrogation. These objections are represented in five of defendant's assignments, each of which presents the question whether it is inadmissible because it was involuntarily extracted from defendant.
On March 12, 1973 the deceased, an eleven year old girl, was reported missing. On the following morning she was found dead, the victim of strangulation and suffocation.
Defendant was routinely questioned by police on the night the victim was reported missing and on the following morning. He was not questioned again until the following Friday, March 16, 1973, at which time he was given a Psychological Stress Evaluation test (known as P.S.E.). This test indicated that defendant was under "stress" when he answered certain of the investigator's questions relating to the death of the victim. On Monday, March 19, 1973 defendant was requested again to come to the sheriff's office in order that the matter could be further investigated.
*132 On this occasion defendant arrived at the sheriff's office at around 6:45 p. m. and was interrogated by Sheriff Capers of West Carroll Parish, Special Agent Vail of the F.B.I., Lieutenant Marson and Sergeant Breaux of the Louisiana State Police, and Messrs. Hughes and Watson of the Morehouse Parish sheriff's office.
According to testimony of the officers present during the interrogation,[2] defendant was immediately advised that he was under no compulsion to remain at the sheriff's office; he was advised orally of his Miranda rights, and he signed a written waiver of these rights (this form is included in the record before us and recites that it was signed at 6:57 p. m.).
Defendant was then interrogated as to his involvement, if any, in the murder of the victim. He was given the P.S.E. test three times before approximately 11:30 p. m., the time of the first confession, and was informed that each test indicated that he was under "stress" in his responses. Between each test defendant would request to speak to Sergeant Breaux, and, seeking advice, would tell him, "the machine says I'm lying." The officer's response was that defendant should take the test again. At approximately 11:30 p. m., after four and one-half hours of questioning, defendant gave an oral confession, which was immediately followed by a written confession. At this time he was palpably upset, taking approximately fifteen minutes to write his one paragraph confession.
Subsequently, defendant demonstrated for interrogating officers the position in which he had left the body of the victim at the scene of the crime; each officer testified that the position demonstrated by defendant was identical to that in which the body of the victim had been found.
Defendant then asked to speak to the district attorney, for whom he had done some work in the past, and told him, in privacy, that he (defendant) had let him and his (defendant's) parents down by killing the victim. Defendant gave the district attorney a description of the murder, identical to that previously given to police officers, which was admitted at trial.
The third oral inculpatory statement admitted at trial was given to Sheriff Capers just prior to the formal arrest of defendant at 4:45 a. m. It amounted to defendant's statement, "I did it."
Defendant contends that although he was informed of his right to an attorney he was told that he didn't need one inasmuch as he was there only to "help them out if he could." He contends that during the interrogation he was told that his fingerprints had been connected with the case; that tire tracks left by his car had been taken at the scene of the crime; that samples of the victim's hair had been found in his car; and that dirt matching samples taken at the scene of the crime had been found in his car. Defendant also argues that although he was told at the beginning of the interrogation session that he could leave, it later became apparent that he could not; moreover, he maintains that he asked agent Vail how long he would be kept and that the agent told him "that is up to the district attorney." Except for this testimony given by defendant at the motion to suppress, there is nothing in the record which tends to support his allegations.
Two psychiatrists who examined the accused reported that defendant's intelligence quotient ranged from 86 to 90, the borderline between normal and dull normal.[3] *133 Both doctors joined in this report, although one had initially classified defendant as retarded.
The question of "voluntariness" as it relates to confessions has been recently discussed by the Supreme Court of the United States in Schneckloth v. Bustamonte, supra. There the court noted that there is no "talismanic" definition of voluntariness and that there are societal interests to be balanced:
"Rather, `voluntariness' has reflected an accommodation of the complex of values implicated in police questioning of a suspect. At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws. See Culombe v. Connecticut, supra, at 578-580, 81 S.Ct., at 1865-1866. . . . At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice. `[I]n cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.' Blackburn v. Alabama, 361 U.S. 199, 206-207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242. See also Culombe v. Connecticut, supra, 367 U.S., at 581-584, 81 S.Ct., at 1867-1869; Chambers v. Florida, 309 U.S. 227, 235-238, 60 S.Ct. 472, 476-478, 84 L.Ed. 716." (412 U.S. 218, 224, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854).
The court further stated that the determination whether a defendant's will has been overborne turns upon all the facts of the case:
"In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstancesboth the characteristics of the accused and the details of the interrogation. . . ." (412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854).
Having reviewed the jurisprudence dealing with this determination,[4] we are unable to agree that defendant's confession was given involuntarily.
Defendant was not brought to the stationhouse, rather he was asked to appear and did so free of duress. Defendant was apprised of his rights previous to the commencement of any interrogation. He was informed that he was not under arrest and that he was free to leave if he so desired. During the four and one-half hours of interrogation preceding defendant's confessions, he was not denied the assistance of counsel and, as previously noted, he had been cautioned as to his absolute right to remain silent and his right to require that the questioning be terminated if he desired an attorney. The record before us demonstrates no change in these circumstances prior to the time of defendant's confessions.
To require more of investigating officers would be to place too great a burden on "the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws" and distort the concept of "voluntariness" embraced by the Fifth Amendment to the federal Constitution and Art. I, § 16, La.Const. of 1974.
The confessions were not inadmissible, but because of the restriction placed on the voir dire examination, the conviction and sentence are reversed and the case is remanded to the district court for a new trial.
*134 SANDERS, C.J., dissents.
BARHAM, J., concurs in decree of reversal, being of opinion the confessions were coerced through psychological persuasion of an enormous magnitude.
NOTES
[1] See Schneckloth v. Bustamonte, 412 U.S. 218, 224, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973), where the United States Supreme Court, referring to the body of cases involving the determination of the voluntariness of confessions, opined:

"Those cases yield no talismanic definition of `voluntariness,' mechanically applicable to the host of situations where the question has arisen. `The notion of "voluntariness,"' Mr. Justice Frankfurter once wrote, `is itself an amphibian.' Culombe v. Connecticut, 367 U.S. 568, 604-605, 81 S.Ct. 1860, 1880-1881, 6 L.Ed.2d 1037. . . ."
[2] Messrs. Hughes and Watson administered the P.S.E. test and had no other function relating to the interrogation nor were they present during the interrogation by other officers.
[3] According to the psychiatrists, the normal range is from 90 to 100 whereas retardation ranges from 55 to 60.
[4] See cases cited in Schneckloth, supra, 412 U.S. at 226, 93 S.Ct. 2041, and in Spano v. New York, 360 U.S. 315, 321, fn. 2, 79 S.Ct. 1202, 3 L.Ed.2d 1265.