616 So.2d 664 (1993)
STATE of Louisiana
v.
Carl HALL.
No. 92-KA-0362.
Supreme Court of Louisiana.
April 12, 1993.
*665 Richard V. Kohnke, M. Craig Colwart, New Orleans, for applicant.
Richard P. Ieyoub, Atty. Gen., Harry F. Connick, Dist. Atty., Donald Albert Rowan, Jr., Asst. Dist. Atty., Richard L. Olivier, Asst. Dist. Atty., Jack Peebles, Asst. Dist. Atty., for respondent.
MARCUS, Justice.[*]
Carl Hall was indicted by the grand jury for the first degree murder of his wife, Cathy Hall, in violation of La.R.S. 14:30. After trial by jury, defendant was found guilty as charged. A sentencing hearing was conducted before the same jury that determined the issue of guilt. The jury unanimously recommended that a sentence of death be imposed on defendant. The trial judge sentenced defendant to death in accordance with the recommendation of the jury.
On appeal, defendant relies on seventeen assignments of error for the reversal of his conviction and sentence, six of which have been briefed. Finding reversible error in the assignments relating to restriction on voir dire, we reverse defendant's conviction and sentence and remand to the district court for a new trial, pretermitting discussion of defendant's other assigned errors.

FACTS
The victim in this case, thirty-two year old Cathy Hall, had dated defendant for about ten years and had been married to him for about three years. At the time of this incident, the two had been separated for about two or three months. The couple had two children, Carl, Jr. and Carlita.
On the evening of August 23, 1990, the victim and her friend, Hubert Steib, went to drop off her nephew, Benny Taylor, at a friend's house near the intersection of Mistletoe and Pritchard Place in the Carrollton section of New Orleans. Steib was driving a white two door Oldsmobile Cutlass Supreme, with the victim in the passenger seat and Taylor in the back seat. Steib did not know the address of the house and passed it up. He pulled to the side of the road in order to back up. Seeing another car behind him, he waited until that car *666 passed before he backed up. The car behind him turned out to be driven by defendant, and pulled directly along side Steib's vehicle, less than three or four inches away. Defendant then began firing a gun into Steib's vehicle. Steib told the victim and Taylor to get down. He attempted to push the victim down, and in the process was shot in the arm. Unable to get out of the driver's side door, Steib crawled out of the passenger side window, opened the passenger side door and told the victim to run. Steib ran toward an alley, and, upon turning back, learned the victim had not followed him.
Steib's car continued to roll forward and, at some point, the victim got out of the car and broke her leg. The car continued to roll until it hit a fence, at which time Taylor got out. Taylor saw the victim lying in the middle of the street and saw defendant hitting the victim with what appeared to be a pistol. Upon getting closer, Taylor realized defendant had a knife and was stabbing the victim. The victim attempted to defend herself and told defendant, "[p]lease, Carl, don't kill me." Defendant called the victim a "bitch" and told her "not to play with him like this or mess with him like this." When the victim "could move no more," defendant jumped into his car and drove off.
Two neighbors, Julia Robinson and Edith Pennington, witnessed the stabbing. Ms. Robinson was sitting on her steps of her Pritchard Place residence when she heard gun shots and saw Steib running around the side of her house. She saw the victim lying in the intersection and saw a man stabbing her, saying "[b]itch, I told you I was going to get you." After the stabbing, she saw the man put his knife and gun in a bag, get in his car and drive off. Ms. Pennington was in her house on Mistletoe Street when she heard gun shots. She went outside to call her dog and saw the stabbing taking place. She heard the victim pleading "[d]on't do it, please, don't do it," to which the person who was stabbing her replied, "I told you I was going to do it." She saw the person pick up what appeared to be a gun and a knife, calmly go to his car and drive off.
Officer Jonathan Jenkins and his partner were the first to arrive on the scene, at approximately 7:35 p.m. Officer Jenkins checked the victim for vital signs, but did not find any. Detective Norman McCord conducted the homicide investigation. He arrived on the scene at approximately 8:05 p.m. He found a 1983 white Oldsmobile Cutlass Supreme crashed into a fence, with the passenger door open and the driver's door closed. He noted what appeared to be two bullet holes in the driver's door and located an additional bullet hole in a residence on Pritchard. In the middle of the intersection, he saw a small pool of blood and not far from the blood was a paper or cardboard knife sheath. The victim was transported to Ochsner. Dr. Susan Garcia, a forensic pathologist employed by the Jefferson Parish Coroner's Office, performed an autopsy on the victim's body. The autopsy revealed the victim had bled to death due to multiple stab wounds to her chest and abdominal region. Dr. Garcia identified fifteen stab wounds, eight of which were potentially lethal. She found the victim probably lost consciousness within three to five minutes and would have been near death within ten to fifteen minutes after the stabbing.
On the basis of their investigation, police issued a warrant for the arrest of defendant, who turned himself in.

Assignments of Error 1, 4 & 7 (Voir Dire)
Defendant contends that the trial judge erred in limiting the defense's examination of prospective jurors during voir dire, both in the area of principles of law and rehabilitation of jurors opposed to capital punishment. He argues he was thereby denied his constitutional right to full voir dire examination.
The record reveals several instances in which the trial judge curtailed defense counsel's efforts to rehabilitate jurors who expressed opposition to capital punishment. During questioning by the state, prospective juror Katherine Jackson expressed opposition to the death penalty and indicated *667 that she could not consider it under any circumstances. In attempting to rehabilitate, the defense asked Ms. Jackson whether, assuming she was selected for the jury, she could even discuss the possibility of imposing the death penalty, to which she replied in the negative. The defense then asked, "[a]nd if the facts wereif Saddam Hussein, were on trial here." The state objected, and the trial judge sustained the objection, stating he would not permit that type of question.
Prospective juror Myraline Jamison (a church worker and Bible student) was challenged for cause by the state on the basis of her opposition to the death penalty. During the defense's rehabilitation, the following exchange took place:
BY MR. KOHNKE:
Your Honor, if I may. Miss Jamison, if hypothetically, just to give you a certain circumstance, but if the evidence were to show in this case that Mr. Hall gunned down a classroom of children and there was a video camera rolling and he's smiling
BY THE COURT:
Are those the facts in this case?
BY MR. KOHNKE:
No, Your Honor, obviously they are not.
BY THE COURT:
I am not going to permit you to ask that question.
BY MR. KOHNKE:
I object to the Court limiting my questions.
A similar exchange took place when the defense attempted to rehabilitate Karen Joseph, who had been challenged by the state on the basis of her opposition to capital punishment. The defense posed a hypothetical situation involving a "serial killer, someone who has killed multiple people, and has done it in the past." The trial judge refused to permit the question on the ground that it did not involve the facts of the case. Likewise, the trial judge refused to allow the defense to pose hypotheticals not involving the facts of the case during the examination of Yolande Adams, Doris Major, Wendy Hicks, Sylvia Bernard, Nicole Brown, Marilyn Dorsey and Carlen McLin. Each of these jurors opposed capital punishment and was excused for cause by the trial judge.
The record also reveals several instances where the trial judge limited defense counsel's discussion of legal principles during the voir dire. While exploring the concept of reasonable doubt, the defense asked a prospective juror, "[w]hat happens if the law and evidence do not fit a certain crime and a reasonable doubt exists, what is the only available verdict ...?" The trial judge interrupted, telling the defense counsel not to commit the jurors, but to "[j]ust ask them if they could follow the law. If they could follow the law that's all that's necessary." The defense counsel then continued his examination by telling the jurors that "if a reasonable doubt exists to a certain crime, it's either a lesser verdict or a not guilty verdict, everyone understand that?" Again, the trial judge interrupted, stating "you are doing the same thing." He went on to say, "[t]he question is can they follow the law as given by the Court," which was "all that's required of them."
Later, defense counsel asked the prospective jurors whether, assuming the state proved defendant killed the victim, they would automatically conclude that there was nothing else they could consider except first or second degree murder; in other words, whether they had "problems recognizing manslaughter as a valid statute," trying to explain that "sometimes murders occur because of anger, heat of blood, and passion." The trial judge interrupted, instructing counsel to "ask people generally the question. The question is can you accept the law as given to you by the Court?" The judge then addressed the prospective jurors directly, asking them if there was any reason they could not accept the law as given by the court. When they responded in the negative, the judge told counsel to move on. The defense then went on to discuss specific intent under second degree murder, which led to the following exchange:
BY JUROR #313, Patricia Ann Shelby:
*668 Second degree murder is like premeditated?
BY MR. KOHNKE:
Well, premeditation is almost, in my opinion, like specific intent. When we specifically intend to do something, I mean, it takes some premeditation.
BY THE COURT:
Mr. Kohnke, the jurors have already stated that they can follow the law as given by the Court. The Court's going to explain all this to you in the instructions at the conclusion of the trial.
BY MR. KOHNKE:
Your Honor, I was just trying to respond
BY THE COURT:
Unless you have anywell, we can't spend the voir dire time inin educating the jury as to what the law is. All we can do is ask them ifif they have any objections to the law.
BY MR. KOHNKE:
Your Honor, IIwith all due respect I take exception to that because II think the jury understands the law, and that they can accept
BY THE COURT:
Theythey can't understand the law until it's given to them, but you can't teach it to them, that's what I am trying to tell you. You can't give them a course in the law at this stage of the proceedings. You can only ask them whether they agree to accept the law as given to them by the Court.
BY MR. KOHNKE:
Okay. Your Honor, I would like to ask that I be allowed to discuss with Miss Shelby the concept of premeditation.
BY THE COURT:
I'll permit you to read the law to them and ask them if they accept it, that's all I am going to permit you to do.
BY MR. KOHNKE:
Okay.
BY THE COURT:
I am not going to let you discuss anything.
Subsequently, the defense counsel discussed reasonable doubt in the context of first degree murder. He asked the jury if specific intent to kill or inflict great bodily harm on more than one person as an element of first degree murder was established if the "best you can say" is that the "state did a pretty close job," that it proved "more likely than not" or "proved probably that he intended to inflict great bodily harm." The state objected on the ground that "[t]his isn't a quiz," and the trial judge agreed with the state. Counsel resumed his questioning, only to be interrupted once more:
BY MR. KOHNKE:
Let me ask you this. From what definitions that the d.a. has given you, and the Court has given to other jurors, is beyond a reasonable doubt a greater burden than the possibilities or probabilities?
BY THE COURT:
No, I am not going to permit you to do that. Youyou are quizzing the juror. Ask the juror whether she could follow the law as to reasonable doubt as given by the Court, that's all that's important here, not whether she knows civil law or anything else.
The trial judge then asked the prospective juror if there was any reason why she could not follow the instruction of the court and adhere to the principle of reasonable doubt, to which the juror responded that she could.
La. Const. art. 1, § 17 guarantees that "[t]he accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily." La.Code Crim.P. art. 786 further provides that the court, the state and the defendant shall have the right to examine prospective jurors and the scope of the examination shall be within the discretion of the court. The purpose of voir dire examination is to determine qualifications of prospective jurors by testing their competency and impartiality. It is designed to discover bases for challenges for cause and to secure information for an intelligent exercise of peremptory challenges. The scope of voir dire examination is within the sound discretion of the trial judge and his ruling will not be disturbed on appeal in the *669 absence of a clear abuse of discretion. However, although the trial judge is vested with discretion to limit the voir dire examination, he must afford wide latitude to counsel in the conduct of voir dire examination to effectuate the accused's right to full voir dire of prospective jurors embodied in La. Const. art. 1, § 17. In order to determine whether a trial judge has in fact afforded a sufficiently wide latitude to the defendant in examining prospective jurors, a review of the trial judge's rulings should be undertaken only on the record of the voir dire examination as a whole. State v. Williams, 457 So.2d 610 (La.1984); State v. Jackson, 358 So.2d 1263 (La.1978).
After a review of the record of the entire voir dire examination, we find that the trial judge failed to temper the exercise of his discretion by giving the "wide latitude" to counsel for defendant in his examination of prospective jurors, as required by our cases. State v. Frith, 412 So.2d 1000 (La.1982); State v. Hayes, 364 So.2d 923 (La.1978); State v. Boen, 362 So.2d 519 (La.1978); State v. Jackson, 358 So.2d at 1267. Rather, the trial judge displayed a "grudging attitude" toward the defense's questions, an attitude we disapproved of in State v. Duplessis, 457 So.2d 604, 607 (La.1984) ("the trial judge displayed a grudging attitude toward the asking of those proper questions, resulting in the appearance before the jury that defense counsel was wasting time on frivolous technical defenses.").
Most objectionable in our view was the trial judge's restriction of defense counsel's examination on issues of law, such as elements of the offense, reasonable doubt and specific intent. Counsel was allowed to read the statutory definitions of pertinent offenses and managed some discussion of these issues, but the pattern of the rulings clearly impaired defense efforts to plumb the prospective juror's understanding of the nuances of applicable law and legal principles. This ability to understand the law was particularly critical in a case such as the present one, where the facts were virtually undisputed and the case would turn on issues such as whether the killing was manslaughter or murder and whether there was evidence to support the elements of first degree murder. Nonetheless, the trial judge curtailed the defense's efforts to explore with the jurors the concept of reasonable doubt as it related to specific intent to kill more than one person and refused to allow the defense to explore the jurors' ability to accept manslaughter, insisting to counsel that the only relevant question was whether the jurors could accept the law as given to them by the court.
The trial judge's limitation of the defense's questioning to whether the jurors would accept the law as given has never been favored in our law. Rather, this court has rejected the contention that unjustified restrictions on voir dire can be cured by a response on the part of a prospective juror that he will follow the law as given to him by the judge when the juror is unaware of the complexity of the law and where that law involves such a basic right of the defendant. State v. Lee, 559 So.2d 1310, 1316 (La.1990); State v. Brumley, 320 So.2d 129 (La.1975). Counsel must be permitted to informally question the juror of his own experiences and attitudes that may influence his ability to follow the law. A juror's response to less imposing questions may well reveal attitudes and biases not disclosed by superficially correct answers. State v. Lee, 559 So.2d at 1316; State v. Hayes, 364 So.2d at 924; State v. Hills, 241 La. 345, 129 So.2d 12, 31 (1961) (on rehearing).
Accordingly, we find the trial judge's limitation on the defense's ability to examine prospective jurors on their understanding of the law constitutes reversible error. Having found reversible error on this issue, we need not pass on the trial judge's limitation on voir dire examination in connection with the rehabilitation of jurors opposed to capital punishment, although we note that the trial judge's restrictions in this area reinforce our view that he abused his discretion in limiting the overall voir dire.[1]

*670 DECREE
For the reasons assigned, defendant's conviction and sentence are reversed, and the case remanded to the trial court for a new trial.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Hall, J. was not on the panel which heard and decided this case. See the footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] Clearly, when a juror is challenged for cause because of his answers concerning the death penalty, defense counsel must be given the opportunity to traverse the juror for rehabilitation. State v. Sullivan, 596 So.2d 177, 187 (La.1992); State v. David, 425 So.2d 1241, 1249 (La.1983). Arguably, however, had the only erroneous rulings occurred in connection with rehabilitation of jurors opposed to capital punishment, such error may solely implicate the penalty phase.