665 So.2d 390 (1995)
STATE of Louisiana, Plaintiff-Appellee,
v.
Gary STACY, Defendant-Appellant.
No. 27136-KA.
Court of Appeal of Louisiana, Second Circuit.
October 5, 1995.
Order Adopting and Reinstating Opinion after Grant of Rehearing December 22, 1995.
*392 Indigent Defender Office by John M. Lawrence, Shreveport, for Appellant.
Paul J. Carmouche, District Attorney, Hugo Holland, Jr. and Catherine M. Estopinal, Asst. District Attorneys, Shreveport, for Appellee.
Before NORRIS and LINDSAY, JJ., and EDWARDS, J. Pro Tem.
NORRIS, Judge.
Gary Stacy was indicted by the Caddo Parish grand jury for the second degree murder of Kenneth Loston and Latson Williams. La.R.S. 14:30.1A(1), (2). The jury found him guilty of two counts of manslaughter, and the trial court sentenced him to ten years at hard labor on each count, to run consecutively. Stacy appeals the conviction and sentence, advancing nine assignments of error. Because the trial court committed reversible error in restricting Stacy's voir dire examination, we reverse the convictions and sentences and remand the case for a new trial.

Facts
The instant case stems from a double homicide that took place in Shreveport on September 28, 1991. The previous evening, Stacy (a/k/a "Youngster"), who was 16 years old at the time, rode from his hometown of Houston to Shreveport with Donny Gilliard, Jr. (a/k/a "Donny, Jr."), Wesley Thomas (a/k/a "Boo") and Michael Birklett (a/k/a "Mikey"). Gilliard drove the group in a van he had borrowed from his uncle, Calvin Sam Ford.
The next day, they brought the van for repairs to Professional Automotive, where Anthony "Amp" Ford, Sam Ford's brother, worked. The group stayed at the shop awaiting completion of the repairs. During this time, Kenneth Loston and Latson Williams drove up and spoke to Thomas about buying some cocaine, but left without any drugs. According to Gilliard, at Thomas's request, he drove him and the other members of the group to the parking lot of the Caddo Career Center, about 15 blocks from the shop, where Loston and Williams were waiting in their car; Gilliard knew only that Thomas wanted to rob the two men. By Gilliard's account, Edward Charles Carter (a/k/a "Bobo"), a mechanic and acquaintance of theirs who worked at the body shop, also accompanied them.
Gilliard testified that after he parked, Stacy, Thomas and Birklett, each armed with a gun, jumped out of the van and approached the victims' car. Stacy and Birklett fired into the driver's side at Williams and Thomas fired at Loston from the passenger side. All three then got back into the van and Gilliard drove away. Stacy, on the other hand, maintained that he was unaware of any criminal plan, never fired a weapon, and only got out of the van for a moment to see what was happening. He recalled two persons shooting from the driver's side, but placed no one on the passenger's side.
The testimony of the state's expert witnesses, crime scene analyst, Sergeant Mark Rogers and forensic pathologist, Dr. Brenda Reams, coincided with Gilliard's account of the number of shooters. Based on the evidence, they identified three separate weapons and three separate shooters. The defense's expert crime scene analyst, Don Norris, could not rule out this theory; he opined that any number of shooters was possible. An eyewitness to the shooting, Tyrone Washington, was unable to identify Stacy as the shooter, but did place him at the scene of the crime.
The Shreveport police responded to reports of a disturbance at the Caddo Career Center and arrived to find the dead, bullet-riddled bodies of Loston and Williams. The police also recovered a large amount of cash from the victims' car. Stacy, Thomas, Birklett and Gilliard returned to Houston. The Houston police subsequently arrested all but Birklett; his identity was yet unknown. Stacy and Thomas had three guns in their possession at the time of their arrest, including a 9 mm weapon confirmed to have been used in the shooting.
*393 Stacy appeals his conviction and sentence, asserting numerous assignments of error, including an argument that the trial court erred in refusing to allow defense counsel during voir dire to question venire members regarding "parties to the crime" and "accessory after the fact." He argues he was thus denied his constitutional right to full voir dire examination. We find reversible error in the trial court's ruling, barring defense counsel from ascertaining the prospective jurors' inclinations and ability to comprehend the accessory after the fact theory. Nevertheless, we will consider Stacy's assignments regarding suppression of evidence and the trial court's allowance of alleged hearsay testimony by a deputy coroner. We pretermit consideration of the remaining assignments.

Voir Dire Examination
During voir dire examination, defense counsel attempted to define accessory after the fact by reading La.R.S. 14:25. The trial court, on its own motion, stopped the proceedings, removed the prospective jurors from the courtroom, and held a conference on the matter. Defense counsel argued that based on the evidence, he planned to present the defense that Stacy was an accessory after the fact rather than a principal; in order to exercise an intelligent peremptory challenge, he sought to examine the prospective jurors' comprehension of an accessory as distinguished from a principal. The prosecutor argued it was improper to define accessory after the fact because it was not a responsive verdict to the offense charged. In rejecting the inclusion of accessory after the fact in voir dire, the judge reasoned:
Well, to begin with, accessory after the fact has notis a crime and has not been charged in this offense. I havecertainly counsel is able to say that what happened after the killing, alone, cannot convict this defendant of being a principal for the offenses charged, and he may argue that.
Evenhowever, even if the man is a principal, what happened after the offense may well be admissable [sic] in proving of the other offense, I mean, of the offense itself. So I have no objection to counsel arguing that if someone does things after the offense, then he may notthat alone wouldn't make him guilty. What counts is what happened before the offense or during the offense.
Now, I don't see any sense inhe may argue that. But so far as reading the definition of accessory after the fact, I don't see that. Those things, everything that goes to either guilt or innocence of the crimes charged, is admissable [sic]. But whether there's a separate charge or definition of accessory after the fact will do nothing but confuse the jury. And the reading of that definition is not to be allowed. But as I say, anything else that goes to the guilt or innocence is.
You may introduce the same facts, make the argument that what happens after the fact is notdoesn't prove that he's a principal. It's what happens before and during the offense is the only thing that would go toward proving guilt of this defendant. And I have no objection at the time the jury is instructed to fashioning a special charge which will point that situation up to the jury. But it will not use the definition of accessory after the fact. It may say principally the same thing, but it's not going to include that. All right.
R. pp. 1003-1004.
Defense counsel objected to the court's ruling, but nonetheless complied and made no reference to accessory after the fact during voir dire examination.
In State v. Hall, 616 So.2d 664 (La.1993), the Louisiana Supreme Court clearly and succinctly stated the law pertaining to voir dire examination:
La. Const. art. 1, § 17 guarantees that "[t]he accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily." La. Code Crim.P. art. 786 further provides that the court, the state and the defendant shall have the right to examine prospective jurors and the scope of the examination shall be within the discretion of the court. The purpose of voir dire examination is to determine qualifications of prospective jurors by testing their competency and impartiality. It is designed to discover bases for challenges for cause and to secure information *394 for an intelligent exercise of peremptory challenges. The scope of voir dire examination is within the sound discretion of the trial judge and his ruling will not be disturbed on appeal in the absence of a clear abuse of discretion. However, although the trial judge is vested with discretion to limit the voir dire examination, he must afford wide latitude to counsel in the conduct of voir dire examination to effectuate the accused's right to full voir dire of prospective jurors embodied in La. Const. art. 1, § 17. In order to determine whether a trial judge has in fact afforded a sufficiently wide latitude to the defendant in examining prospective jurors, a review of the trial judge's rulings should be undertaken only on the record of the voir dire examination as a whole. Hall, 616 So.2d at 668, 669 (citations omitted).
Upon reviewing the entire record of voir dire examination, we find the trial judge failed to temper his much discretion and allow defense counsel the wide latitude prescribed by our law and jurisprudence for examining prospective jurors. The trial judge improperly restricted defense counsel's inquiry into the prospective jurors' understanding of and attitude toward Stacy's accessory after the fact defense.
We dealt with a similar issue in State v. Shepard, 468 So.2d 594 (La.App.2d Cir.1985). During voir dire examination at Shepard's second degree murder trial, the court excluded all discussion of manslaughter. We reversed finding the court's ruling denied Shepard the opportunity to determine the prospective jurors' attitudes and inclinations toward the principles involved in the crime of manslaughter, principles vital to his defense. State v. Shepard, supra at 598.
A notable distinction here, as argued by the state, is that accessory after the fact is not a responsive verdict to second degree murder. La.C.Cr.P. art. 814. Regardless, the reasoning in Shepard dictates a logical extension to the instant case. As in Shepard, the prospective jurors' comprehension and views of the principles involved in the crime of accessory after the fact were critical to Stacy's defense. Stacy contended at trial that he did not know of any plan to rob or murder the victims and did not participate in the act; thus, he was only an accessory after the fact and not guilty of any offense responsive to second degree murder. The jury could have reasonably inferred this from evidence presented at trial. The trial court recognized the applicability of this defense as it ultimately charged the jury on the theory of accessory after the fact. See and compare State v. Williams, 606 So.2d 1387 (La.App.2d Cir.1992), appeal after remand 26,716 (La. App.2d Cir. 5/10/95), 658 So.2d 703. The court's ruling on voir dire, however, denied defense counsel the opportunity to examine the prospective jurors' ability to distinguish a principal from an accessory after the fact, and any potential reluctance or inability to apply the law of accessories. Allowing defense counsel to explain using the law of principals, that a defendant's actions after a crime may not make him a principal, simply cannot serve to cure the defect.
Voir dire examination should encompass the applicable law, legal principles and issues relevant to defendant's case. See State v. Frith, 412 So.2d 1000 (La.1982) (reversed conviction based on improper denial of voir dire examination into prospective jurors' attitudes toward defendant's right against self-incrimination); State v. Boen, 362 So.2d 519 (La.1978) (reversed conviction based on improper denial of voir dire examination into relationship between prospective jurors and police officers); State v. Mickey, 626 So.2d 24 (La.App. 1st Cir.1993) (reversed conviction for cocaine distribution based on improper denial of voir dire examination into defendant's family members' and friends' use or possession of drugs). Clearly, although accessory after the fact is not responsive to second degree murder, the theory is relevant to Stacy's defense and thus within the scope of voir dire examination. See Williams, supra.
The trial judge ultimately noted the relevance of the crime of accessory after the fact; he charged the jury on the law of accessory after the fact, and allowed defense counsel to argue the theory in both opening and closing statements. The state contends this cured any error committed in voir dire examination. We simply cannot agree. Stacy's *395 defense counsel was denied the opportunity to examine the jurors' competency and impartiality concerning the principle of accessory after the fact at the time of jury selection, thereby undermining a crucial aspect of voir dire examinationdiscovering bases for challenges for cause and securing information for an intelligent exercise of peremptory challenges. Hall, supra at 668. Consequently, the trial judge's prejudicial curtailment of voir dire examination tainted Stacy's constitutional right to a fair trial by jury and warrants reversal. Shepard, supra.

Suppression of Evidence
Stacy contends that the trial court erred in denying his motion to suppress physical evidence seized at the time of his arrest, and a statement he made to Shreveport police after his arrest.

I. Physical Evidence

Stacy argues that his arrest was illegal and tainted the subsequent seizure. We therefore must consider the events surrounding Stacy's arrest. Shreveport detectives', Michael Price and Don Ashley's, investigation into the homicide led them to believe the suspects wanted for the murders had returned to Houston. After obtaining arrest warrants for Stacy, Gilliard and Thomas, Detective Ashley informed Sergeant David Ferguson of the Houston police by phone about the existence of the arrest warrants. He then sent to the Houston police by teletype information regarding the warrants, including the warrant numbers, the court and bond. Sergeant Ferguson and his partner, Sergeant Eugene Yanchak located the three suspects with Gilliard's uncle's help. Gilliard phoned his uncle and the police traced the call to the Sunflower Terrace Apartments.
When police arrived at the complex, Gilliard voluntarily surrendered. Sergeants Ferguson and Yanchak learned that Thomas and Stacy were in another apartment in the complex, and also that the apartment was rented to a woman with two children; the complex did not allow male residents. This information and their observation of fresh pry marks on the door led them to suspect a possible hostage situation. With the help of the maintenance man, the police entered the apartment and found only the two men, feigning sleep in different bedrooms. The police arrested them, and seized some weapons and ammunition in plain view from the bedroom where Stacy was found. They recovered a MAC-10 9 mm weapon lying on top of a pile of dirty clothes, a .22 and .357 sticking out from the mattress and boxsprings, ammunition for a 9 mm lying on top of a black bag in an open closet, and $391.00 from Stacy's person.
Stacy moved to suppress this evidence. The trial court denied the motion finding that the arrest was legal based on the teletype information received from the Shreveport police regarding the outstanding warrants in Louisiana, and that Stacy had no expectation of privacy in the apartment and thus could not complain of improper seizure.
Stacy contends on appeal that his arrest was illegal because the police had no probable cause. Stacy does not argue that the arrest warrant issued in Louisiana was invalid for want of probable cause. Thus, the only issue is whether the Houston police were entitled to act upon their confirmed knowledge of the existence of a valid arrest warrant issued for Stacy in Louisiana.
In United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Supreme Court addressed a similar situation. There the Court found that police made a valid Terry stop in Covington, Ohio on the basis of a "wanted flyer," supported by reasonable suspicion, and received by the Covington Police Department by teletype from the police department in St. Bernard, Ohio, where the robbery had occurred. The Court noted:
In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense; it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction.
Hensley, supra at 229-31, 105 S.Ct. at 681. The Court also favorably cited Whiteley v. *396 Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), in which evidence was seized during a vehicle stop based on a statewide law enforcement radio network broadcast, for the proposition that "when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who issued the flyer possessed probable cause to make the arrest." Hensley, supra.
In a similar case, the Fifth Circuit held that a warrantless arrest was valid, where the Bienville parish police arrested suspects wanted for counterfeiting based on a radio broadcast by the Ouachita Parish Sheriff's Department, describing the suspects and their car and requesting assistance in arresting them. United States v. Maryland, 479 F.2d 566 (5th Cir.1973). The Court stated:
The probable cause concept concerns probabilities. "These are not technical; they are the factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians act." We think the information given to law enforcement authorities by the victim of the crime immediately after its occurrence was clearly sufficient to supply probable cause for appellant's arrest. Further, the Deputy Sheriff who actually made the arrest was entitled to rely on the radio bulletin which originated from the Ouachita Parish Sheriff's Department.

Maryland, supra at 569 (citations omitted).
In the instant case, we find that the Houston police were justified in relying on the teletype sent by the Shreveport police informing them of the existence and substance of the Louisiana arrest warrants. Stacy never questioned the validity of the warrants; he does not claim there was no probable cause for their issuance. Consequently, the Houston police had a valid and sufficient basis upon which to arrest Stacy. Maryland, supra. The subsequent search was made incident to a valid arrest.
Furthermore, Stacy had no standing to challenge the evidence as improperly seized as he had no expectation of privacy in the apartment searched. Stacy may not assert the exclusionary rule unless his Fourth Amendment right has been violated. Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); United States v. Ibarra, 948 F.2d 903 (5th Cir.1991); State v. McKinney, 93-1425 (La.App. 4th Cir. 5/17/94), 637 So.2d 1120. To establish a violation, Stacy must first show that he had a legitimate expectation of privacy in the area searched. Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); Ibarra; McKinney, supra. The U.S. Fifth Circuit set forth the following factors to consider:
Whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy and whether he was legitimately on the premises.
United States v. Haydel, 649 F.2d 1152 (5th Cir.1981), cert. denied, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982). The Louisiana Supreme Court has established a twopart test as to whether a defendant has a constitutionally protected expectation of privacy; he must show he has a reasonable expectation of privacy in the area searched and that society is prepared to accept that expectation as objectively reasonable. State v. Ragsdale, 381 So.2d 492, 497 (La. 1980).
Stacy does not address this issue in brief. Regardless, the evidence shows that Stacy neither rented nor had the tenant's permission to be in the apartment searched; in fact, men were not allowed on the premises. Furthermore, Gilliard testified that Thomas had brought the black bag, containing the weapons and ammunition, from Houston. Thus, on the evidence presented, we find that Stacy has failed to show a reasonable expectation of privacy in the area searched. Moreover, such an expectation would certainly not be objectively reasonable. We therefore conclude that Stacy lacked standing to contest the search and seizure.
Even assuming arguendo that Stacy had standing to complain of a Fourth *397 Amendment violation, the evidence was admissible under the "plain view" doctrine. The officers had a prior justification for entering the apartment, discovered the evidence inadvertently, and it was immediately apparent that the items were evidence or contraband. See State v. Lee, 25,917 (La. App.2d Cir. 5/4/94), 637 So.2d 656, writ denied, 94-1451 (La. 10/7/94), 644 So.2d 631. In sum, we find no reversible error.

II. Statement

On October 1, Stacy was arrested, read his Miranda rights, and taken to the homicide division of the Houston Police Department. He lied to officers regarding his age, and believing he was 18, the officers brought him before a magistrate who informed him of his right to remain silent, right against self-incrimination and right to counsel. At that time, Stacy told the Houston police he did not want to make a statement. The next morning, Shreveport authorities informed the Houston police that Stacy was, in fact, only 16 years old. Thus, Stacy was brought before a juvenile judge who informed him again of his rights. Neither the Shreveport nor Houston police attempted to question Stacy at this time because of his juvenile status. Detectives Price and Ashley testified they did not know that the Houston police had tried to question Stacy and that he had exercised his right to remain silent.
On October 3, Stacy waived extradition back to Louisiana and Detectives Price and Ashley drove him back to Shreveport. Upon return, they immediately asked Stacy's mother to come to the station, read the Miranda warnings to both of them, and allowed them to privately discuss the situation. Stacy's mother testified at trial that during this discussion she told her son to tell the truth, "to sing like a nightingale." When the officers returned, both indicated they understood the rights read to them and signed waiver forms. Stacy expressly waived his right to have counsel present. He then gave an oral statement, later reduced to writing, to police. During questioning, however, he stated he did not want to answer any more questions about the incident. At this point, the officers terminated all questioning regarding the double homicide.
Stacy contends that this statement violated his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He argues it should have been suppressed because it violated his constitutional right to remain silent, which he invoked in Houston. He also indicates that the questioning was improper because he was not provided with counsel.
The evidence establishes that Stacy did invoke his right to remain silent when he refused to make a statement to Houston authorities. Nevertheless, Miranda did not create a per se proscription of indefinite duration on further questioning once a defendant invokes his right to remain silent. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Once in Louisiana, Stacy was again read his Miranda rights and, upon his mother's advice, agreed to give a statement. The admissibility of a statement under these circumstances depends on whether the defendant's right to cut off questioning was "scrupulously honored." Michigan v. Mosley, supra; State v. Brooks, 505 So.2d 714, 722 (La.1987). Resolution of this issue depends on "the totality of the circumstances involved under the particular facts of each case." State v. Brooks, supra. Factors to consider include who initiates further questioning, the time delay between the original request and subsequent interrogation, whether Miranda warnings were given before each interrogation, whether waiver of rights forms were signed, and whether or not pressures were exerted on the defendant by police between the time he invoked his right and the subsequent interrogation. State v. Brooks, supra; State v. Simpson, 629 So.2d 468 (La.App. 3d Cir. 1993).
Upon his arrest, Houston authorities attempted to question Stacy; he refused to make a statement at that time. The next day, Shreveport detectives arrived and disclosed Stacy's true age, but he was not questioned again until the following evening upon his return to Shreveport, at least 48 hours after Stacy initially declined to give a statement. Both he and his mother were given *398 the Miranda warnings again before questioning. They were given sufficient time to privately discuss the situation; on his mother's advice, Stacy decided to make a statement and both signed waiver forms. This procedure was in compliance with State in Interest of Dino, 359 So.2d 586 (La.1978). Finally, the officers terminated questioning about the incident immediately upon Stacy's request. In light of these facts, we conclude that the Shreveport police "scrupulously honored" Stacy's right to remain silent.
Contrary to Stacy's argument, a thorough review of the record reveals that he never invoked his right to counsel. See Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Under Miranda, Stacy's decision to remain silent does not raise a presumption that he cannot proceed without counsel present. Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 2099, 100 L.Ed.2d 704 (1988); Michigan v. Mosley, supra at 104 n. 10, 96 S.Ct. at 326 n. 10.
This assignment does not present reversible error.

Deputy Coroner's testimony
By this assignment, Stacy contends the trial court erred in allowing the deputy coroner for Caddo and Bossier Parishes and expert in the field of forensic pathology, Dr. Brenda K. Reams, to testify to the number of shooters based on her review of the autopsy and other medical reports and evidence. He urges the admission of this alleged "hearsay" evidence violated his right of confrontation guaranteed by the Sixth Amendment and La. Const. art. I, § 16.
At trial, Stacy objected to the testimony as hearsay under La.C.Cr.P. art. 105 and based on State v. Monroe, 345 So.2d 1185 (La.1977), because Dr. Reams did not perform the autopsy on either victim.[1] The trial court overruled the objection. Dr. Reams was thus allowed to testify to the victims' death and cause thereof, weapons used, bullet trajectory, resulting wounds, and her opinion as to the number of shooters.
State v. Monroe, supra, is plainly distinguished. There the Supreme Court reversed the lower court's ruling allowing the Orleans Parish coroner to testify to the results of a medical examination of a rape victim by the assistant coroner. The Court stated:
Article 105 does not authorize admission of coroner's reports to prove any facts other than death and cause of death. Therefore, La.C.Cr.P. art. 105 does not authorize the introduction of the extrajudicial statements objected to by defendant.
State v. Monroe, supra at 1187 (citations omitted). Clearly, neither the assistant coroner's report nor coroner's testimony related to death or cause of death as required by art. 105. In the instant case, however, there was no question as to the admissibility of the coroner's report itself, and likewise no doubt that art. 105 allowed Dr. Reams to testify as to the victims' deaths and the cause thereof despite the fact that she did not perform the autopsy or prepare the report. See State v. Kelly, 375 So.2d 1344 (La.1979); State v. Straughter, 630 So.2d 884 (La.App. 4th Cir. 1993); State v. Ducre, 596 So.2d 1372 (La. App. 1st Cir.), writ denied, 600 So.2d 637 (1992).
As an expert forensic pathologist, Dr. Reams may also testify, based on information obtained from others, as to her opinion on other issues in the case. La.C.E. art. 703; State v. Brossette, 93-1036 (La.App. 3d Cir. 3/2/94), 634 So.2d 1309, writ denied, 94-0802 (La. 6/24/94), 640 So.2d 1344. The Brossette court, in allowing an expert DNA witness to interpret and explain the results of DNA tests performed by non-testifying laboratory technicians in an aggravated rape case, explained:
An expert witness may testify based on information obtained from others and the method of testing affects only the weight to be afforded the expert's conclusion. The expert witness testifying in court need not be the person who actually drew the blood, performed the test or compiled the *399 statistics for comparison. He may rely on data prepared by other technicians.
State v. Brossette, supra at 1316 (citations omitted).
Dr. Reams, accepted by the court as an expert in the field of forensic pathology, stated for the record the reports and factual evidence upon which she relied in forming her expert opinion. In sum, we find that the trial court did not err in allowing Dr. Reams to testify about the murders and present her expert opinion as to the number of shooters based on reports prepared by others.

Conclusion
Having found that the trial judge's restriction on the defense's voir dire examination constitutes reversible error, we reverse Stacy's manslaughter convictions and sentences and remand the case for a new trial.[2]
REVERSED; CASE REMANDED.
Before SEXTON, NORRIS and WILLIAMS, JJ., and CLARK and EDWARDS, JJ. Pro Tem.

ON APPLICATION FOR REHEARING
NORRIS, Judge, on rehearing.
The court granted the State's motion for rehearing in the instant case pursuant to URCA Rule 2-18.5 and subsequent to the retirement of one of the members of the original three-judge panel.
After further deliberations, we now adopt and reinstate our original opinion in this matter. In so doing, we wish to emphasize the defendant's constitutional right to "full voir dire examination of prospective jurors." La. Const. art. 1 § 17. Voir dire is broad in scope so the defendant may determine the jurors' qualifications by testing their competency and impartiality, discover challenges for cause, and intelligently exercise peremptory challenges. State v. Hall, 616 So.2d 664 (La.1993). Here, the jury's ability to grasp the difference between an accessory after the fact and a principal to murder was critical to the defense. Stacy basically conceded he was guilty of wrongdoing, but strenuously protested his innocence as a principal to murder. Thus he sought to probe the venire members' understanding of parties to the crime by reading the definitions contained in the criminal code. Stacy was entitled to do this in the effort to ascertain whether the jurors would comprehend and accept the defense that if they found him guilty as an accessory after the fact they would be legally obligated to acquit him of the charged offense.
The abridgment of voir dire was prejudicial because there is a reasonable possibility that it might have contributed to the conviction. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Since on the evidence presented the jury returned a lesser verdict of manslaughter, it is likely they felt his culpability was less than that of a true principal. Had the jury consisted of members who were shown to understand the accessory theory of defense, the outcome may have been different.
We further observe that the district court's subsequent decision to allow defense counsel to argue its theory both in opening and closing statements did not cure the constitutional deficiency. The error was prejudicial abridgment of voir dire, thus depriving the defendant of the means to discover whether prospective jurors understood the concept of parties or should be the subject of peremptory challenges.
ORIGINAL OPINION ADOPTED AND REINSTATED. CONVICTION AND SENTENCE REVERSED; CASE REMANDED.
CLARK, J. Pro Tem., dissents with written reasons.
CLARK, Judge Pro Tem., dissenting.
Because I believe the majority unduly broadens the scope of voir dire examination *400 under the circumstances shown by the evidence in this case, I respectfully dissent.
The defendant, a sixteen-year-old boy, was at the scene of a multiple homicide, and there was evidence he was one of the shooters. He fled the scene with the other participants and was arrested later in Houston in possession of one of the guns used in the crime. The jury found him guilty of manslaughter, a responsive verdict to the charge of second degree murder.
I recognize that the defendant had "a right to full voir dire examination" as guaranteed by La. Const. art. 1 § 17. An accused, however, is not afforded unlimited inquiry during the voir dire examination into all possible areas of prejudice of the prospective jurors, including their opinions on evidence to be offered at trial, hypothetical questions, and questions of law which call for any pre-judgment of supposed facts. State v. Burton, 464 So.2d 421 (La.App. 1st Cir.), writ denied, 468 So.2d 570 (La.1985).
Accessory after the fact was not a responsive verdict in the instant case. Thus, as the trial judge properly concluded, questions regarding the concept of accessory after the fact could have possibly confused the prospective jury members. Such questions would have concerned a crime that was not charged to defendant and that was not a responsive verdict to the charged offense.
Defense counsel was given the opportunity to argue the defense theory in both opening and closing statements. In addition, the trial judge charged the jury on the law of accessory after the fact. Therefore, defendant was not prevented from presenting this defense to the jury.
I do not subscribe to the holding that the defense was prejudiced to the extent that a different verdict might have been rendered under a consideration of all of the evidence of guilt presented and the instruction of law given by the court. The jury had the opportunity to consider all of the evidence and to reflect on the law as given by the judge in reaching that verdict. That law included an instruction of the law of accessory after the fact, as well as the law of principal. It seems to the writer that it is just as plausible to believe the jury rendered the lesser verdict of manslaughter because of the young age of the defendant as it is to hold that the outcome might have been different had they been examined on their understanding of the law of accessory after the fact versus the law of principal.
In short, I do not believe there was a violation of this defendant's right to full voir dire examination as provided in La. Const. art. 1 § 17. While defendant was entitled to wide latitude in his questioning of the prospective jurors, this inquiry was not unlimited. State v. Burton, supra. Excluding questions concerning a crime which was not a responsive verdict to the charged offense and which would tend to confuse the jury and promote an unnecessary line of questioning was appropriate. A jury's function is to determine the guilt or innocence of the accused by deciding whether the state proved all elements of the charged crime beyond a reasonable doubt. State v. Lacoste, 256 La. 697, 237 So.2d 871 (1970) (emphasis added). Queries into other crimes not charged to a defendant that would possibly fit the facts of the case could lead to an endless array of questions irrelevant to this function of prospective jury members.
NOTES
[1] La.C.Cr.P. art. 105 reads in pertinent part:

A coroner's report and proces verbal of an autopsy shall be competent evidence of death and the cause thereof, but not of any other fact.
[2] Because Stacy was previously convicted of manslaughter, he may not be retried for any greater offense. Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); State v. Clark, 231 La. 807, 93 So.2d 13 (1957); State v. Magouirk, 539 So.2d 50 (La.App.2d Cir.1988), recall in part, appeal after remand 561 So.2d 801 (La.App.2d Cir.), writ denied, 566 So.2d 983 (1990).