ROBERT M. MURPHY, Judge.
12Pefendant, Readus Williams, appeals his convictions and sentences for the second degree murder of Lanell Darden, in violation of La. R.S. 14:30.1; aggravated flight from an officer, in violation of La. R.S. 14:108.1(C); and illegal possession of stolen things in excess of $500.00, in violation of La. R.S. 14:69. For the following reasons, we affirm defendant’s convictions and sentences.

FACTS AND PROCEDURAL HISTORY

On March 11, 2010, the Jefferson Parish Grand Jury indicted defendant, on Count 1, for second degree murder in violation of La. R.S. 14:30.1; on Count 2, for aggravated flight from an officer in violation of La. R.S. 14:108.1(0; and on Count 3, for illegal possession of stolen things in excess of $500.00 in violation of La. R.S. 14:69. Defendant was arraigned the next day and pled not guilty to all charges. On September 10, 2010, defendant’s motions to suppress evidence, ^identification, and statements were denied after a hearing. On August 22, 2011, defendant filed a motion to appoint a sanity commission. On Sep *133 tember 14, 2011, a competency hearing was subsequently held, after which the trial judge found defendant competent to stand trial.
On September 20-24, 2011, the case was tried before a 12-person jury which unanimously found defendant guilty as charged on all counts. On October 5, 2011, defendant’s motion for new trial and motion for post-verdict judgment of acquittal were denied. After waiving sentencing delays, the trial judge sentenced defendant to life imprisonment at hard labor on Count 1 without benefit of parole, probation, or suspension of sentence; imprisonment at hard labor for two years on Count 2; and imprisonment at hard labor for ten years on Count 3, with all sentences to run consecutively to each other and to any other sentence defendant might be serving. On October 11, 2011, defendant filed a motion to reconsider sentence that was denied. Two days later, defendant filed a timely motion for appeal that was granted.
After Hurricane Katrina in 2005, Lanell Darden, her children, and her uncle Donald Darden moved from Kenner, Louisiana to Orlando, Florida. In 2009, Lanell and defendant began a romantic relationship, which quickly became abusive. About four days after the relationship began, defendant took Lanell’s vehicle from her because he did not want her to go anywhere. Defendant took Lanell’s keys, put a knife under her neck, and threatened her. At some point, defendant moved into the home of Lanell and her uncle.
In November of 2009, Lanell went to the house of her neighbor, Beatrice Bush, crying and hysterical. When Ms. Bush went outside, defendant told Ms. Bush, this “B-tch killed my baby.” Someone called the police, who arrived and spoke with Lanell. Several other incidents involving defendant occurred where the |4poIice had to be called to Lanell and her uncle’s home on December 8, 9, and 16, 2009. Lanell subsequently got a restraining order against defendant. Afterward, defendant moved across the street from Lanell’s house. La-nell continued to see defendant despite the restraining order.
In January of 2010, Lanell ultimately decided to end her relationship with defendant and move back to Kenner to live with her sister, Yolanda Darden, at 1013 31st Street, Apartment No. 11, in Kenner. La-nell had told Ms. Bush on three occasions that she thought her life was in danger at the hands of defendant. According to Donald Darden, defendant appeared to be “a little bothered” by the fact that his relationship with Lanell had ended.
After January 11, 2010, Yolanda received a phone call from defendant who asked to speak to Lanell; she told him, however, that Lanell was unavailable. On January 15, 16, and 17, 2010, Yolanda received text messages from that same phone number. On January 15, 2000, defendant asked Yolanda to have Lanell call him. On January 16, 2000, defendant sent the same message, but added that if Lanell called him, he promised he would never call her again. The next day, defendant sent Yolanda a text message saying he needed Lanell to talk him “off this ledge I’m on,” and to please have her call him as he was “going crazy.” Another text asked Yolanda to have Lanell call him.
In January of 2010, defendant borrowed the computer of his friend, Carol Cone, to obtain directions to Lanell’s sister’s residence. On January 20, 2010, Ms. Cone loaned her 2001 red Dodge Durango truck to defendant. Although defendant was supposed to return the vehicle to her at her place of employment by 10:00 p.m., he never returned. The next day, Ms. Cone reported her vehicle stolen.
*134 On January 21, 2010, Lanell took her son and Yolanda’s son to G.T. Woods Elementary School, which is located across the street from the apartment complex. IfiAt approximately 8:00 a.m., Alexis Lewis, a resident at the apartment complex, saw a girl, later identified as Lanell, running from the apartments and screaming. The girl ran in front of him and got into a vehicle. Mr. Lewis then saw a man in a black shirt running and chasing her with a black gun. The man pushed Mr. Lewis out of the way and shouted that the girl was “pregnant for him.” The man then shot three times, hitting the girl. After he shot, the man said, “B-tch, I’m going to kill you.” Afterward, the man walked through the breezeway of the apartment complex to a vehicle.
Numerous officers from the Kenner Police Department heard over the police radio that there was a shooting at 1013 31st Street and that the perpetrator had left the scene in a red Dodge Durango. Officer Nicholas Patterson noticed a red Dodge Durango next to him in traffic. He angled his unit behind the Dodge Durango and Officer Kevin Ballard angled his unit in front. The driver of the Dodge Duran-go then went up on the grassy area by the sidewalk and went around Officer Ballard’s unit and continued through the red light.
The officers pursued the Dodge Duran-go with their lights and sirens activated. The Dodge Durango first went southbound on Loyola Drive to I — 10 and then westbound on the interstate. The driver of the Dodge Durango led numerous police officers on a high-speed chase on the interstate with speeds reaching 135 miles per hour. During the chase, the driver of the Dodge Durango made a U-turn on the interstate and drove in the wrong direction, causing drivers to swerve out of the way and run off the road. The Dodge Durango eventually turned around and headed in the correct westbound direction.
As the Dodge Durango entered the Three-Mile Bridge on the interstate, the driver swerved toward the guardrail. Sergeant Russell Moran observed a splash of water from the side of the bridge and radioed that the driver had probably just | ^thrown the gun into the water. The Dodge Durango crossed the bridge, pulled to the shoulder and came to a stop. Officers took the driver into custody and later identified defendant in court as the driver of the Dodge Durango.
Sergeant Moran then retrieved a white loose-leaf sheet of paper on the ground and saw it had directions from Ocala, Florida to 1013 31st Street in Kenner, the location of the shooting. Mr. Lewis positively identified defendant as the person who shot the girl. Mr. Lewis told the detective that based on the face and body type, it looked like the same person who did the shooting. In checking the defendant’s person for weapons, former officer Robert Bales, Jr. recovered Lanell’s Florida Identification Card.
Detective Jeff Adams went to the crime scene and observed a tan or brown-colored Suburban in the parking lot at 1013 31st Street. He saw the deceased victim lying in the vehicle halfway out of the passenger door, with her legs dangling towards the ground. Detective Adams noticed two casings near the front of the vehicle on the passenger side near the open passenger door, one casing behind the vehicle, and one casing that fell out of the driver’s side door when it was opened. A black hat was located next to the vehicle.
Detective Adams advised defendant of his rights, and defendant signed the waiver of rights form. In a preliminary interview, defendant told Detective Adams that he and Lanell had been dating for eight months, and that she was three months *135 into a pregnancy when he found paperwork in her purse indicating she had aborted their child. He said that they then argued until Lanell’s uncle intervened. He saw marks on Lanell and called the police. When the police told defendant he would have to leave, defendant then moved across the street from Lanell to a friend’s house.
| -^Defendant said that after he saw La-nell drive away, he used a computer and found Lanell and Yolanda’s address in Louisiana and wrote down the directions. Defendant admitted using Ms. Cone’s vehicle and driving to Kenner. He arrived at 3:00 a.m. and parked at 1013 31st Street in the parking lot. Defendant said he sat there and watched Lanell walk the children to school. He then exited his vehicle and went to the breezeway to wait for her return. When she approached the breezeway, he tried to talk to her; however, she took off running. Defendant explained that he chased after her, and then “blacked out.” The next thing he knew, he was on the interstate being chased by the police, and he realized he must have done something wrong.
Defendant admitted that he had a gun in his pocket when he was at the apartment complex and that he threw it into the water during the chase. After throwing the gun into the water, defendant pulled over and surrendered to the police. Detective Adams testified that in an interview defendant stated that he realized he had done something “stupid,” that he would not have Lanell anymore, that Lanell’s children would not have a mother, and that he would be serving a life sentence in prison.
Witnesses at the school, Clara Clemens and Syd Campbell, testified they saw a man walking with a gun in his hand after hearing gunshots. Ms. Clemens was inside of the school, and Mr. Campbell was standing in the breezeway between the cafeteria and the classrooms, when they heard the shots. The detective showed a photographic lineup to both witnesses. They each identified two possible subjects out of a photographic lineup, one of which was defendant.
Dr. Karen Ross, an expert in the field of forensic pathology, performed the autopsy on Lanell, age 29 at the time of her death. She testified that the cause of death was a gunshot wound to the head, and that the manner of death was | ¡¡homicide. She explained that the projectile, which she recovered during the autopsy, went through the skull and brain and was visible underneath the skin beneath the lower jaw.
A dive team recovered a gun at the location where Sergeant Moran saw a splash in the water. Jene Rauch, qualified as an expert in the field of the examination of firearms and toolmarks, conducted two examinations, one before the gun was recovered and one after. She concluded that the four cartridge cases found at the scene were fired from the same weapon. Once she received the gun, she further concluded that the four casings from the scene were fired from the gun retrieved from the water. Ms. Rauch also asserted that the projectile recovered from the victim during the autopsy was fired from that same gun. Gerald Roser, a crime scene technician for the Kenner Police Department, performed a gunshot residue test on defendant and Lanell, and the tests were positive. ■
Sarah Serou, qualified as an expert in DNA analysis, testified that she received four cuttings from the black hat found at the scene and a reference sample from defendant. She explained that the DNA profile obtained from three of the hat cuttings was consistent with the DNA profile from defendant’s reference sample. Ms. Serou further explained that the DNA profile from the fourth hat cutting was consis *136 tent with a mixture of DNA from at least two persons, one major contributor and one minor contributor, and that the DNA profile from defendant’s reference sample could not be excluded as being the major contributor in this mixture. It was Ms. Serou’s opinion that the DNA profile from the fourth hat cutting was over 100 billion times more likely to be a mixture of DNA from defendant and an unknown, unrelated individual than a mixture of DNA from two unknown, unrelated individuals.
IcThe shooting at the apartment complex was captured on videotape and shown to the jury.

ASSIGNMENTS OF ERROR ONE AND TWO

In related assignments of error one and two, defendant contends (1) that the trial court improperly restricted appellant’s constitutional right to a full voir dire by refusing to allow him to question the jurors regarding their ability to understand and apply the law and (2) for failing to include the law applicable to the case and/or for failing to include the requested special charge that the jury could return a responsive verdict despite the evidence of guilt. At trial, defendant sought to voir dire and have the jury instructed on nullification issues.
Defendant first argues that the trial judge improperly restricted his constitutional right to a full voir dire by refusing to allow him to question the jurors regarding their ability to understand and apply the principles of State v. Porter, 93-1106 (La.7/5/94), 639 So.2d 1137. He contends that Porter allows a jury to return a responsive verdict even though the evidence supports the charged offense.
The State responds that the trial judge did not improperly restrict defendant’s voir dire. It further responds that Porter is distinguishable from the instant case and, is therefore inapplicable. The State notes that unlike the court in Porter, the trial judge here did not exclude any responsive verdicts, and that what defendant actually sought at trial in the instant case was an instruction equivalent to jury nullification. The State responds that this Court has already rejected jury nullification instructions in State v. Seals, 09-1089 (La.App. 5 Cir. 12/29/11), 83 So.3d 285, writ denied, 12-293 (La.10/26/12), 99 So.3d 53, and State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, writ denied, 11-1753 (La.2/10/12), 80 So.3d 468, cert. denied, - U.S. -, 133 S.Ct. 139, 184 L.Ed.2d 67 (2012).
[ inDefendant also argues that the trial judge erred by failing to instruct the jury on the law applicable to the case and/or by failing to include the requested special charge that the jury could return a responsive verdict despite the evidence of guilt. The State responds that the trial judge properly rejected any jury instruction equivalent to jury nullification, and that the general jury charge, which tracked the pattern jury charge concerning responsive verdicts, was sufficient. The State further responds that considering the overwhelming evidence of guilt, defendant has not shown that any limit placed on him during voir dire, and the refusal to charge the jury on jury nullification, constituted a miscarriage of justice, prejudice to the substantial rights of defendant, or a substantial violation of a constitutional or statutory right.
During voir dire, defense counsel told the prospective jurors that he wanted to talk about Porter with them. The prosecutor objected, and a bench conference was held. The prosecutor contended that defense counsel was erroneously attempting to say that the jury had the ability to nullify. Since defense counsel did not have a copy of Porter, the prosecutor asked that they not go into it during voir *137 dire, but they could go into it at a later time if defense counsel subsequently presented case law. Defense counsel agreed, stating that was fair, and further agreed it would give him a chance to find the Porter case and then discuss it in his closing argument. During the trial, after the State’s fourth witness had testified, defense counsel moved for a mistrial, arguing that defendant was entitled to a full voir dire, which he did not receive because he was not allowed to discuss the law as written in Porter. He argued that according to Porter, a criminal defendant had the statutory right to a jury free to return a lesser verdict even though the evidence clearly supported a conviction of the charged offense. Defense counsel noted that he had objected during voir dire to the prosecutor asking the jury whether it would |nreturn a guilty verdict on second degree murder, if the evidence supported it. He explained that he would have chosen the jury differently had he been allowed to discuss Porter with them.
The prosecutor responded that defense counsel received a full and fair voir dire, and that defense counsel was not prohibited from discussing Porter pursuant to any court order. Rather, the prosecutor noted that he and defense counsel had jointly agreed that the issue would not be discussed in voir dire until they could resolve the Porter case to everyone’s satisfaction. Defense counsel replied that he had acquiesced to that decision, but did not agree to it. The trial judge told defense counsel that he had agreed to it and that he and the prosecutor had decided to move on. In effect, the trial judge, denied defendant’s motion for mistrial. After two more of the State’s witnesses testified at trial, defense counsel again moved for a mistrial based on Porter, which the trial judge denied.
On the morning of the third day of trial, the trial judge stated that she had read Porter and State v. Guidry, 94-596 (La.App. 3 Cir. 11/2/94), 649 So.2d 486, writ denied, 94-2953 (La.3/17/95), 651 So.2d 267, two cases cited by defense counsel. Defense counsel reiterated that the holding of Porter was that a criminal defendant had the right to a responsive verdict notwithstanding the overwhelming evidence that the primary offense had been committed. He alleged that the prosecutor had elicited a promise from the prospective jurors during voir dire that they would return a guilty verdict if the State proved its case beyond a reasonable doubt. The trial judge recalled the matter, but said that she had asked the prosecutor to rephrase and that he had.
Later on during the trial, jury charges were discussed. Defense counsel said he wanted a jury charge on Porter and Gui-dry, but the prosecutor objected. The 1 atrial judge asked defense counsel for his proposed jury charge so she could review it at a later time.
At another point during the trial, jury charges were discussed again. Defense counsel asked the trial judge to delete the phrase “that if you find the State has met its burden of proving its case beyond a reasonable doubt that you must return a guilty verdict.” He stated that that would solve the Porter problem. The prosecutor subsequently requested the standard jury instructions, which the trial judge said she would use. Defense counsel replied that just because the court had been using that language for a long time did not make it right.
The trial judge said she would instruct the jury as follows: “In order to convict the Defendant of second degree murder you must find beyond a reasonable doubt that the State proved every element of the Defense [sic] charged. If you’re not con- *138 vineed beyond a reasonable doubt that the Defendant is guilty of the Defense [sic] charged, but you’re convinced beyond a reasonable doubt that the Defendant is guilty of a lesser included offense then you should reflect that on your verdict form.” Defense counsel responded that he had no problem with that instruction and would review it. The trial judge said they would discuss it again the following day.
After the last witness testified, jury charges were discussed again. Defense counsel objected to the jury charge that he had no problem with the day before. He said that a true reflection of the law was found in Porter — “The jury must be given an option to convict the defendant of a lesser charge even though the evidence clearly and overwhelmingly supported a conviction of the charged offense.” However, defense counsel said he “would not expect any Louisiana judge to use that language.” The prosecutor responded that the “jury will be given an opportunity to return a responsive verdict, that’s within the pattern jury | ^instructions.” After hearing arguments of counsel, the trial judge said that the jury must have the option to return a responsive verdict, and that the jury would be given the option to return the responsive verdict of manslaughter. Defense counsel noted his objection, arguing that was a qualified option.
Defense counsel then objected to another jury instruction which provided, “If the State fails to prove beyond a reasonable doubt that defendant is guilty of either the offense charged or a lesser offense, then your verdict form should be marked not guilty.” Defense counsel explained that that was a qualifying charge that limited and negated the holding in Porter. The prosecutor replied that that was a pattern jury instruction used throughout the 24th Judicial District Court, and it was appropriate and reflected the current state of the law. Defense counsel responded that that was not the current state of the law. The trial judge overruled the defense’s objections.
After the defense rested its case, the prosecutor gave his closing argument; however, defense counsel elected not to give one. Afterward, the trial judge asked if there were any objections to the jury charges. Defense counsel stated that he had the same objections that he had previously made during the jury charge conference based on Porter.
Defendant was subsequently found guilty as charged, after which he filed a motion for new trial and a motion for post-verdict judgment of acquittal. At the hearing on the motions, defense counsel argued, inter alia, that the trial judge had committed reversible error by not following the holdings of Porter and Guidry. The prosecutor replied that that argument had no merit, as the jury was given the option of returning the responsive verdict of manslaughter in compliance with Porter and Guidry. Defense counsel responded that a violation of the holding in Porter was not harmless error and would be reversed on appeal. After hearing 114arguments of counsel, the trial judge denied the motion for a new trial and the motion for a post-verdict judgment of acquittal.

LAW AND DISCUSSION

La. Const. art. I, § 17 guarantees a defendant full voir dire examination of prospective jurors and the right to challenge jurors peremptorily. The purpose of voir dire is to determine qualifications of prospective jurors by testing their competency and impartiality in order to discover bases for challenges for cause and for the intelligent exercise of peremptory challenges. State v. Hall, 616 So.2d 664, 668 (La.1993). Nonetheless, the scope of examination rests within the sound discretion *139 of the trial court, and its ruling will not be disturbed absent clear abuse. La.C.Cr.P. art. 786; Hall, 616 So.2d at 669. In determining whether the trial court afforded sufficiently wide latitude to defendant, the entire voir dire examination must be considered. Id.
Under La.C.Cr.P. art. 802, the trial court “shall charge the jury ... [a]s to the law applicable to the case[.]” The State and defendant shall have the right to submit special written jury charges. La. C.Cr.P. art. 807. The court shall give a requested special jury charge “if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.” La.C.Cr.P. art. 807. See also State v. Tate, 01-1658, p. 20 (La.5/20/03), 851 So.2d 921, 937, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Fasola, 04-902, p. 19 (La.App. 5 Cir. 3/29/05), 901 So.2d 533, 545, writ denied, 05-1069 (La.12/9/05), 916 So.2d 1055. Failure to give a requested jury charge constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Harris, 01-2730, p. 46 (La.1/19/05), 892 So.2d 1238, 1261, cert. denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005). When a special jury charge is not reduced to writing for presentation to the court, a trial judge may properly refuse to give such a charge. See La.C.Cr.P. art. 807; State v. Davis, 00-278, p. 11 (La.App. 5 Cir. 8/29/00), 768 So.2d 201, 210, writ denied, 00-2730 (La.8/31/01), 795 So.2d 1205.
In Porter, the defendant was indicted for aggravated rape and second degree kidnapping, but convicted of the lesser offenses of forcible rape and simple kidnapping. The Supreme Court granted certio-rari to determine whether the trial court erred in granting the State’s motion to exclude from the list of responsive verdicts the statutorily authorized responsive verdicts of simple rape and attempted simple rape. The Supreme Court stated in pertinent part:
Since before the turn of the century, this court has recognized that a defendant, when charged with a crime for which the Legislature has provided a responsive verdict, has the statutory right to have the jury characterize his conduct as the lesser crime. Treating the jury’s prerogative to return a responsive verdict similar to the jury’s power of nullification, this court has consistently held that the jury must be given the option to convict the defendant of the lesser offense, even though the evidence clearly and overwhelmingly supported a conviction of the charged offense.[1]
Porter, 639 So.2d at 1140 [footnote added].
After a lengthy analysis, the Supreme Court in Porter found that the trial court erred in granting the State’s motion to delete the simple rape and attempt simple rape responsive verdicts. It noted that the defendant had the right to have the jury resolve in his favor any doubts created by the victim’s alcohol consumption regarding either the degree of compulsion exercised by the defendant or the degree of resistance exercised by the victim, and to have the jury return a verdict of guilty of simple rape or attempted simple rape. *140 The Supreme Court also 1T ¿found that this error was not harmless, since the lesser verdicts returned indicated the jury’s refusal to accept unconditionally the victim’s version of events and, therefore, there was the possibility that the jurors might have returned an even lesser verdict provided by statute, if given the option to do so. Porter, 639 So.2d at 1144.
In Jacobs, supra, the defendant argued that the trial court erroneously denied the following proposed instruction that was based on Porter, supra: ‘You may convict the defendant of the lesser offense, even though the evidence clearly and overwhelmingly supported a conviction of the charged crime.” Citing State v. Sharp, 35,714 (La.App. 2 Cir. 2/27/02), 810 So.2d 1179, writ denied, 02-1736 (La.6/6/03), 845 So.2d 1081, this Court concluded that the trial court did not err in rejecting the proposed charge.[2] This Court found that in this case, as in Sharp, the use of the defendant’s proffered charge might have caused the jury to misunderstand or even disobey the law on responsive verdicts. This Court asserted that the record showed the trial court properly instructed the jury that it could return a verdict of a lesser-included offense, and that the judge had explained that the responsive verdicts were: guilty of second degree murder, guilty of manslaughter, guilty of negligent homicide, and not guilty. This Court found that since the defendant’s requested special jury charge was included in the court’s general charge, the general jury charge was sufficient to impart the law on responsive verdicts to the jury. Jacobs, 07-887 at 52-55, 67 So.3d at 573-75.
|17In State v. Legrand, 02-1462 (La.12/3/03), 864 So.2d 89 (unpublished app.), cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005), the defendant asserted that the trial court erred in refusing to instruct the jury that, “Even if you are convinced beyond a reasonable doubt that the defendant is guilty as charged, you may return that verdict or any of the lesser verdicts.” Instead, the trial court instructed the jury as to the charge and responsive verdicts and told them if they were “not convinced that the defendant is guilty of First Degree Murder, you may find the defendant guilty of another lesser offense, if you are convinced beyond a reasonable doubt that the defendant is guilty of a lesser offense.” The trial judge went on to say that “[i]f the state has failed to prove beyond a reasonable doubt that the defendant is guilty of either the offense charged or of a lesser responsive offense, the form of your verdict should be Not Guilty.”
The Louisiana Supreme Court in Le-grand found that the defendant’s requested special charge was an accurate statement of Louisiana law as found in State v. Porter, supra. However, the Supreme Court also found that a defendant was not necessarily entitled to an instruction in this respect, as a direct and blatant appeal to Louisiana’s traditional approach to jury *141 compromise potentially conflicted with La. C.Cr.P. art. 790, which required jurors to swear an oath that they will “render a verdict according to the law and the evidence.” The Supreme Court stated that at any rate, the trial court had rejected the instruction at issue because it simply reiterated the law of responsive verdicts to the jury. Citing Sharp, supra, the Supreme Court concluded that the jury was clearly instructed that it could return a verdict of guilty of the lesser included offense of manslaughter and, therefore, a special instruction on the same issue was unwarranted. State v. Legrand, 02-1462 at 30-3, 864 So.2d 891 (unpublished app.).
|18In Seals, supra, the defendant alleged that the jury was erroneously instructed that it could not nullify the verdict. Citing Porter, supra, the Seals court explained that jury nullification was a recognized practice that allowed the jury to disregard uncontradicted evidence and instructions by the trial judge. This Court found that the trial judge did not err by refusing to instruct the jury on nullification, noting that the record showed the trial judge gave detailed, correct instructions as to the general law, and he did not specifically instruct the jury that it was prohibited from exercising its power to nullify its verdict. This Court also noted that defendant failed to show how the trial court’s refusal to instruct the jury to disregard the law and the evidence constituted a miscarriage of justice, prejudiced substantial rights of the defendant, or violated a constitutional or statutory right. Seals, 09-1089 at 75-77, 83 So.3d at 342-43.
In the instant case, defense counsel asked the trial judge many times to allow him to question the prospective jurors regarding his understanding of the law in Porter, namely that the jury must be given an option to convict defendant of a lesser charge even though the evidence clearly and overwhelmingly supports a conviction of the charged offense. Defense counsel also asked the trial judge many times for the jury to be instructed as to his interpretation of the ruling in Porter. The trial judge refused these requests. However, we find that the trial judge did not improperly restrict defendant’s voir dire by refusing to allow him to question the jurors regarding their ability to understand and apply the principles of Porter. We further find that the trial judge did not err by failing to include the requested special charge that the jury could return a responsive verdict despite the evidence of guilt.
First of all, defense counsel did not submit a special jury charge in writing; rather, he orally objected to the general jury instructions and informed the trial 1 lajudge that the language of Porter should be utilized therein. Although defense counsel told the trial judge he would provide a proposed written jury instruction based on Porter, the record does not reflect that he ever did. Because the special jury charge was not in writing, we find that the trial court properly refused to give such a charge. See Davis, supra.
Second, even though the special jury charge in question was arguably an accurate statement of Louisiana law as found in Porter, the Louisiana Supreme Court has found that a defendant is not necessarily entitled to such an instruction, because of its potential conflict with La.C.Cr.P. art. 790, which requires jurors to swear an oath that they will “render a verdict according to the law and the evidence.” See Legrand, supra. Also, a review of the entire voir dire in the instant case shows that the trial judge afforded a sufficiently wide latitude to defendant. See Hall, supra.
Additionally, as in Jacobs and Sharp, the record in the instant case shows that the trial judge properly explained that the re *142 sponsive verdicts were: guilty of second degree murder, guilty of manslaughter, guilty of negligent homicide, and not guilty. The record also shows that the trial judge properly instructed the jury that it could return a verdict of a lesser included offense as follows:
In order to convict the defendant of second degree murder, you must find beyond a reasonable doubt that the state proved every element of the offense charged. If you are not convinced beyond a reasonable doubt that the defendant is guilty of the offense charged, but you are convinced beyond a reasonable doubt that the defendant is guilty of a lesser included offense, then you should reflect that on your verdict form.
Further, we find, as this Court did in Jacobs, that since defendant’s special requested jury charge based on Porter was included in the trial court’s general charge, the general jury charge was sufficient to impart the law on responsive verdicts to the jury. Lastly, we find that defendant has failed to show how the trial hncourt’s refusal to instruct the jury to disregard the law and the evidence constituted a miscarriage of justice, prejudiced substantial rights of the defendant, or violated a constitutional or statutory right. See Seals, supra. Assignments of error one and two lack merit.

ASSIGNMENT OF ERROR THREE

In assignment of error number three, defendant contends the trial court erred in failing to declare a mistrial premised upon the State’s mid-trial disclosure of videotape evidence showing appellant in the act of committing the charged offense.
Defendant argues that the trial judge erred by failing to declare a mistrial premised upon the State’s mid-trial disclosure of videotape evidence showing him in the act of committing the charged offense. He contends that prior to trial, the State produced multiple grainy still images and a non-operational disc which purported to show the shooting. Defendant claims that the clarity and impact of the video evidence produced at trial, compared to the still photographs, was so great that it would have changed his trial strategy and even his decision to go to trial. The State responds that considering the overwhelming evidence of guilt, defendant has not shown any prejudice by the trial court’s denial of the motion for a mistrial. The State further responds that any error the trial court may have made in denying defendant’s motion for a mistrial was harmless.
Edward Rohde of the Kenner Police Department testified that he located a video recording of Lanell’s murder from the Kenner apartment complex computer system. He downloaded that video to a thumb drive and returned to the police complex. As Rohde played the video, he captured and saved frames to a folder. Afterward, Rohde saved everything to a CD-Rom which was marked as State’s Exhibit 307. He also identified State’s Exhibits 308 through 341 as still images |2idownloaded from the Kenner Housing Authority Complex computer. The video from that CD-Rom was played for the jury.
While the video was playing, defense counsel objected, and the video was stopped. A bench conference was held, during which defense counsel argued that the quality of the video the State was showing at trial was not the same quality that the State provided to him before trial. Defense counsel explained that the video at trial contained a shooting, and that shooting was not shown on his video. He commented that this situation caught him completely by surprise.
*143 The prosecutor responded that she had called defense counsel the weekend before trial began on Friday, Saturday, and Sunday, and that they had spoken on Friday and Sunday. During those conversations, she told defense counsel that there was software that allowed the video to play nonstop. The prosecutor said she explained to defense counsel that he could use Kodak to display the video full-stream in Windows Media Player. Defense counsel recalled that he and the prosecutor had discussed that they were having trouble opening the video. He said that she had given him the “VLS” website for him to download it so he could view the video. Defense counsel stated that he had downloaded the video, but that he and the prosecutor were having trouble getting it the correct size because the video was upside down or sideways. He said he had no idea that if he downloaded a second source, he would have a full video.
The prosecutor responded that she told defense counsel on at least four occasions that he could come and see the physical property at her office at any time he wanted, and she noted that defense counsel had had that video since May of 2010. After hearing arguments of counsel, the trial judge overruled defense counsel’s objection, stating that defense counsel had open file discovery and the chance to go to the District Attorney’s office to view the video and to make sure l^that he and the State had the same video. Following the trial judge’s ruling, the rest of the video was played for the jury.
The next day, defense counsel moved for a mistrial. He argued that the four-second image of the individual in black coming out from the building and shooting was not displayed in the video he possessed. Defense counsel also noted that he had made certain statements in his opening statement regarding the video he had in his possession that he would not have made had he known about the existence of the State’s full-stream video.
The prosecutor responded that the video was provided to defense counsel in its entirety in the exact format the State had. She explained that she and defense counsel were having the same problem opening up the file six or seven months prior. She further explained that the week before trial, she got her IT department involved and, realizing there were programs that could open that video file, shared that information with defense counsel. The prosecutor said she and defense counsel were on the phone together as they walked through the process of opening the program. She explained that she and defense counsel both realized that there was a four-second delay that was not captured that needed to be recaptured.
Once the technicians resolved the problem, she called defense counsel on Friday and Saturday because she wanted him to have the same information she had. She could not get back in touch with defense counsel, so she sent him an e-mail containing that information. The prosecutor told defense counsel she would be at the office the next day on Sunday and extended an offer to view all the physical evidence in this case, which she had extended on four previous occasions including during regular working hours. The prosecutor said she eventually talked to defense counsel on Sunday and asked him if he had seen her e-mail. He said he had been at the jail but would look at the e-mail. She explained to defense counsel l^at that time that the video would open and play through Windows Media Player. Defense counsel replied that the prosecutor had not informed him that she could access full-stream video and that she had a computer program that could add data to video that was not previously there.
*144 After hearing arguments of counsel, the trial judge denied the motion for mistrial, stating that defense counsel had the opportunity to view everything, and that if the video was an issue, he should have gone to the District Attorney’s office and made sure he and the State had the same video.
Following the guilty verdicts, defense counsel filed a motion for new trial and a motion for post-verdict judgment of acquittal. At the hearing, defense counsel argued that the motions were based, in part, on his being surprised by the State’s video, and that he was not provided with the method of opening the video until the Saturday before trial. The prosecutor responded that the State complied with discovery obligations by turning over the video of the offense in May of 2010. She further responded that she gave defense counsel numerous opportunities to view the video at her office, and she also provided him with the software necessary to download the full-stream video. After hearing arguments of counsel, the trial judge denied the motions without providing reasons.

LAW AND DISCUSSION

La.C.Cr.P. art. 775 provides that “[ujpon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.” When the conduct does not fall within the mandatory mistrial provisions of La. C.Cr.P. art. 770, the judge has the sound discretion to determine whether the activity or comment so prejudiced the | ^defendant that he could not receive a fair trial.[3] State v. Talbot, 408 So.2d 861, 866 (La.1980). A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to defendant that deprives him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion. State v. Pierce, 11-320, pp. 4-5 (La.App. 5 Cir. 12/29/11), 80 So.3d 1267, 1271.
La.C.Cr.P. art. 718(2) requires the State, on defendant’s motion, to produce documents and tangible objects that are within its possession, custody or control and that are intended for use by the State as evidence at the trial. The State is under a continuing obligation to promptly disclose additional evidence that may be discovered or that it decides to use as evidence at trial. La. C.Cr.P. art. 729.3. When a party fails to comply with the provisions of the discovery articles, “the court may order such party to permit the discovery or inspection, grant a continu *145 anee, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.” La.C.Cr.P. art. 729.5(A). It is within the trial court’s discretion to choose an appropriate remedy for a discovery 12sviolation that will offset any possible prejudice. State v. Chaplain, 03-338, p. 4 (La.App. 5 Cir. 7/29/03), 852 So.2d 1088, 1089.
The State’s failure to comply with discovery procedures does not automatically require reversal. The appellate court must examine the circumstances of the case to determine whether the defendant was prejudiced, and whether any prejudice resulting from the State’s non-compliance with discovery procedure caused the trier-of-fact to reach the wrong conclusion. State v. King, 06-554, pp. 17-18 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 396, writ denied, 07-371 (La.5/4/07), 956 So.2d 600 (citing State v. Sweeney, 443 So.2d 522, 527 (La.1983)).
In State v. Smith, 99-1020, pp. 6-7 (La.App. 5 Cir. 2/29/00), 757 So.2d 74, 77-78, writs denied, 00-1017 (La.3/30/01), 788 So.2d 439 and 01-854 (La.11/21/01), 802 So.2d 631, this Court explained:
The discovery articles are intended to eliminate unwarranted prejudice which could arise from surprise testimony and evidence, to permit the defense to answer the State’s case, and to allow the defendant to properly assess the strength of the State’s evidence in preparing a defense. When the defendant is lulled into a misapprehension of the strength of the State’s ease through the prosecution’s failure to disclose timely or fully, and the defendant suffers prejudice when the undisclosed evidence is used against him, basic unfairness results which constitutes reversible error. However, a conviction will not be reversed on the basis of a discovery violation unless prejudice is shown by the trial court’s adverse ruling.
In State v. Johnson, 11-63 (La.App. 5 Cir. 11/15/11), 78 So.3d 255, the defendant contended that a videotape made by the police during the execution of a search warrant should have been excluded because the State did not provide it to him in a timely fashion during discovery. This Court noted that the defendant had approximately two years notice prior to trial of the existence of the videotape and its contents. It stated that even though defense counsel did not view the videotape, he certainly should have known the items seized in the search. Also, this Court 126found that the defendant did not demonstrate how his defense would have been different had he learned of the videotape prior to trial. This Court concluded that given the circumstances, it could not be said that the defendant was lulled into a misapprehension of the strength of the State’s case nor could it be said that the alleged late disclosure affected his ability to prepare a defense. Id., 11-63 at 8-9, 78 So.3d at 261.
In State v. Chaplain, 03-338 (La.App. 5 Cir. 7/29/03), 852 So.2d 1088, the defendant asserted the trial court erred by not suppressing a videotape of him shoplifting after the State failed to timely disclose its existence. This Court found that the defendant had failed to show any specific prejudice that resulted from the untimely disclosure of the videotape. It stated that by defense counsel’s own admission, the tape corroborated expected testimony and did not reveal any new witnesses. This Court asserted that the defendant did not demonstrate how his defense would have been different had he learned of the videotape prior to trial, and that the defense merely made a broad assertion that he did *146 not have time to prepare a defense to the videotape. It further found that there was no allegation or evidence of bad faith on the part of the State. This Court noted that the trial court provided a sufficient remedy to the defendant when it recessed trial to give the defendant an opportunity to view the videotape. Id., 03-388 at 5-6, 852 So.2d at 1090.
In the instant case, it is noted initially that defendant is alleging a discovery violation and, therefore, a mistrial was not mandatory under La.C.Cr.P. art. 770. Therefore, the decision to grant a mistrial was discretionary. After reviewing the record, we find that no discovery violation occurred. The record reflects that the prosecutor provided the disc containing the video to defense counsel in May of 2010, over one year prior to trial. When the prosecutor realized there was a 127problem opening the video, she had her IT department check into the problem, after which she contacted defense counsel and they walked through the process of opening the video. The prosecutor extended offers numerous times to defense counsel to come to her office to view the video prior to trial; however, he chose not to do so. Additionally, there is no evidence of bad faith on the part of the State. See Chaplain, supra.
In any event, we find that the jury’s viewing of the video of the shooting did not prejudice defendant, as the video only corroborated the other evidence against defendant. Witnesses testified that they observed an abusive relationship between defendant and the victim. Defendant admitted that after the victim moved away, he obtained directions, borrowed a vehicle, and drove from Florida to Kenner in search of the victim. He confessed to being at the crime scene around the time of the shooting, and he told the detective that he had done something “stupid,” that he and the victim’s children would not have the victim anymore, and that he would be serving a life sentence in prison. An eyewitness positively identified defendant as the individual who shot the victim. Following the shooting, defendant led police on a high-speed chase, during which he threw a gun into the water. Testing on the gun showed that it was the murder weapon.
In light of the foregoing, we find that the trial judge did not abuse her discretion by denying the motion for mistrial. This third assignment of error lacks merit.

ERRORS PATENT DISCUSSION

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals one error patent.
[ 2sThere is a discrepancy between the commitment and the transcript involving the sentences. According to the transcript, the sentences were ordered to run consecutively to any other sentence defendant may be serving. However, the commitment does not reflect this. The transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). As such, we remand this matter for correction of the commitment to accurately reflect that the sentences are to run consecutively to any other sentence defendant may be serving. See State v. Hart, 10-905, pp. 11-12 (La.App. 5 Cir. 5/10/11), 66 So.3d 44, 51, writ denied, 11-1178 (La.11/18/11), 75 So.3d 448. We further order the district court on remand to make the entries in the commitment reflecting this change and direct the Clerk of Court to transmit the original of the minute entry to the officer in charge of the institution to which defendant has been sentenced and to the Louisiana Department of Corrections Legal Department. See La.C.Cr.P. art. 892(B)(2);. *147 State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846 (per curiam).

CONCLUSION

For the reasons assigned herein, defendant’s convictions and sentences are hereby affirmed.

AFFIRMED

. It is noted that defense counsel relied upon both Porter and Guidry in his argument in the trial court. However, even though the Third Circuit in Guidry quoted this law in its opinion, the underlying facts in Guidry are not particularly germane to the instant discussion. State v. Guidry, 94-596 at 3-4, 649 So.2d at 488.

. In Sharp, the defendant was tried and convicted of second degree murder. The defendant requested a jury instruction providing that the jury had the option of convicting him of the lesser offense of manslaughter, even if the evidence supported a second degree murder conviction. The trial court rejected the proposed charge. On appeal, the Second Circuit in Sharp found that the trial court had not erred in rejecting the proposed charge, since the trial court clearly instructed the jury that it could return a responsive verdict of manslaughter. The Sharp court explained that to expound the responsive verdict in the way the defendant suggested would require at the very least qualification and explanation, and that there was no Louisiana jurisprudence supporting an argument that it was proper to instruct a jury that it could disobey law and reach a verdict inconsistent with the evidence. Jacobs, 07-887 at 54, 67 So.3d at 575.

. La.C.Cr.P. art. 770 provides: Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
es) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark .or comment but shall not declare a mistrial.